AIR MOD CORPORATION, Defendant Below, Appellant, v. CHARLES W. NEWTON, Plaintiff Below, Appellee.

(*November* 29, 1965)

WOLCOTT, C.J., and CAREY and HERRMANN, J.J., sitting.

*Harold C. Schmittinger,* of Schmittinger & Rodriguez, for defendant below, appellant.

*Joseph Donald Craven,* for plaintiff below, appellee.

Supreme Court of the State of Delaware, No. 39, 1965.

HERRMANN, Justice:

The defendant, Air Mod Corporation, appeals from a judgment of the Superior Court affirming an award by the Industrial Accident Board (hereinafter the "Board") of workmen's compensation to its employee, Charles W. Newton, the plaintiff. The award is attchked upon several grounds: (1) that the finding of a compensable accident is not supported by sufficient evidence; (2) that the finding of a causal connection between the alleged accident and the plaintiff's physical disability is not supported by the requisite quantum of expert medical testimony; (3) that it was reversible error to bar evidence regarding certain questionable statements, as to his physical condition, made by the plaintiff in his application for employment; and (4) that the apportionment provisions of the Delaware Workmen's Compensation Act, 19 *Del.C.* Sec. 2329,[1] should apply.

I.

The pertinent facts are these:

In 1937, the plaintiff suffered a back injury as the result of a

---

[1] 19 *Del.C.* Sec. 2329 provides as follows:

"Sec. 2329. Compensation for disability resulting from occupational and other pre-existing disease

"Whenever any disability from which any employee is suffering following the contraction of a compensable occupational disease, is due in part to such occupational disease, and in part to a pre-existing disease or infirmity, The Board shall determine the proportion of such disability which is reasonably attributed to the occupational disease and the proportion which is reasonably attributable to the pre-existing disease or infirmity, and such employee shall be entitled to compensation only for that proportion of his disability which is reasonably attributable solely to the occupational disease."

fall. For 12 years thereafter, his back pain was intermittent; then progressively more frequent; then continuous. In April 1959, the plaintiff underwent surgery for the condition, the diagnosis being sciatic neuralgia, ruptured intervertebral disc, and discogenic spondylosis. A lumbar laminectomy (surgical removal of the posterior arches of the vertebrae) was performed and discs were removed. The operation included opening of the dura, one of the membrame coverings of the spinal cord. Within a few weeks, the plaintiff returned to the hospital complaining of pain in the left leg and, shortly, thereafter, he was hospitalized again for pain in the right hip and leg. The diagnosis on both of these occasions was sciatic neuralgia.

In September 1959, the plaintiff applied to the defendant for employment as a welder and was hired. On December 30, 1960, according to the plaintiff's testimony before the Board, he slipped and fell in the course of his employment while pushing a hand truck on an icy street pavement. He experienced no pain until he had driven part way home that evening; but thereafter he suffered severe back pains. On January 9, 1961, the plaintiff first made report to the defendant and first consulted a physician about the pain he was experiencing. He made no mention of a fall either in the first report or to the doctor first consulted. On January 23, 1961, the plaintiff signed a statement in which he stated he "did not actually fall from the ice." The plaintiff continued to work for the defendant until the end of March 1961. His record of attendance at work was good both before and after the December 30 incident.

In April 1961, the plaintiff underwent more back surgery, the diagnosis being recurrent herniated intervertebral disc and cauda equina arachnoiditis. The following operative procedures were performed: a lumbar laminectomy involving the same vertebrae as in the 1959 surgery, with extradural removal of an extruded disc fragment; exploration of the cauda equina (aggragation of nerve fibers) for arachnoiditis (inflammation of the arachnoid, a second membrane covering of the spinal cord) and removal of scar tissue overlying the dura; a spinal fusion was also done. During this hospitalization, the plaintiff signed an application form for non-occupational group

accident and health insurance benefits, stating that his sickness or injury did not arise out of his employment.

In July 1961, the plaintiff was again hospitalized for pain. The diagnosis was arachnoiditis cauda equina; a left chordotomy (cutting of pain fibers in spinal cord) was performed. In April 1962, the plaintiff was again hospitalized, the diagnosis being arachnoiditis; this time, the operation was a right chordotomy. Since then, the plaintiff has been completely and permanently disabled, paralyzed from the chest down.

On October 25, 1962, the plaintiff filed a petition for workmen's compensation, claiming that his permanent disability resulted from the occurence of December 30, 1960. The Board found that the plaintiff "strained his back" on that date; that such injury "aggravated the pre-existing back disability" suffered by him; that his disability constituted a compensable occupational disease under Sec. 2329; and the Board awarded compensation accordingly. On appeal by the defendant, the Superior Court affirmed the award, but held Sec. 2329 inapplicable bacause the plaintiff's disability "does not amount to an occupational disease." The defendant takes this further appeal.

## II.

The defendant contends that the occurence of a compensable accident on December 30, 1960 is not supported by substantial evidence. The defendant points to the absence of any eye witness and of any *res gestae;* the continuation of work for over two months; the failure to make any report of the occurrence for ten days; the failure to mention a fall, as described in the hearing before the Board, in any report to the defendent or in any history given to a physician prior to February 14, 1961; and the lapse of two years before a claim for compensation was filed.

Upon review of the record, we agree that the plaintiff's acts and statements are highly inconsistent with his testimony, at the hearing before the Board, of a fall. In the final analysis, however, the question is one of credibility and the weight to be accorded the

plaintiff's testimony. The Board saw and heard the witnesses and considered all the evidence now before us. Our function and the function of the Superior Court on appeal from the Industrial Accident Board, where the Board heard and saw the witnesses, is to determine whether the record made before the Board shows substantial evidence sufficient to support the Board's finding and conclusions. *General Motors Corp. v. Freeman,* 3 Storey 74, 164 A.2d 686 (1960); *Lester Newton Trucking Co. v. Neal,* Del., 204 A.2d 393 (1964(; *Nardo v. Nardo,* Del., 209 A.2d 905 (1965).

It is our opinion that the testimony of the plaintiff, if believed, is substantial evidence sufficient to sustain the Board's finding of a compensable accident on December 30, 1960. Obviously, the Board accepted the plaintiff's testimony, his prior inconsistent statements and acts notwithstanding. We will not substitute our judgment for that of the members of the Board as to credibility. Therefore, the Board's finding of a compensable accident will not be distrubed.

### III.

The defendant claims the lack of the expert medical testimony requisite to establish a causal connection between the occurrence of December 30, 1960 and the plaintiff's present disability. In this connection, the defendant points to the absence of any expert evidence to establish "with reasonable medical certainty" that the fall described by the plaintiff caused the plaintiff's present condition.

Two doctors testified before the Board on behalf of the plaintiff. A neurologist, who had not treated the plaintiff but who heard his testimony before the Board, stated that the fall described by the plaintiff "could result" in the disc injury. The orthopedic surgeon who performed the operation of 1961 testified that, upon opening the dura, a large piece of extruded disc was found; that in his opinion it had been recently extruded because, otherwise, considerable pain would have been experienced and, based upon the plaintiff's statements, it was

assumed that there was "relatively little pain" after the 1959 operation; that, according to the medical records (the operating surgeon being unavailable as a witness), the subsequent chordotmies were performed as surgical pain relief to relieve "continuing" and "intractable" pain caused by reformed adhesions of nerve roots resulting partially from prior surgery and partially from the fall; and that the plaintiff's present condition, as found by the surgeon on December 20, 1962 after the second chordotomy, was, in his opinion, "consistent" with the plaintiff's description of a fall, and "could have" resulted therefrom.

Admittedly, from a legal point of view, a more positive causal connection between the occurrence of December 30, 1960 and the plaintiff's disability would be disirable; and, unquestionably, the "reasonable medical certainty" test, furnishing probability of causation rather than mere possibility, is preferable when obtainable. We must recognize, however, the understandable reluctance of medical witnesses to be dogmatic as to causation of a physical condition. In the thinking and reasoning of a physician, we realize, the realm of probability and the realm of possibility often overlap. Semantics must give way in the search for a fair and just result; and the distinction between words like "possible", "probable", "reasonable certainty", and the like, may not be over-emphasized. A "could have" answer of a medical witness, such as we have here, may not be isolated and considered alone; it must be considered in the light of all of the other evidence in the case. *General Motors Corp. v. Freeman,* supra; Annotation 135 A.L.R. 516; 2 Larson's Workmen's Compensation Law, Sec. 80.32. In the instant case, considering the medical testimony in the light of all of the evidence, we have reached the conclusion that it is sufficient to establish the requisite causal connection and to sustain the award.

There is a loose end in this part of the case which needs securing. It appears that the orthopedic surgeon based his opinion of a recent disc extrusion upon the assumption that the plaintiff suffered "relatively little pain" after the operation of 1959. The Board barred the defendant from testing this assumption by examining the plaintiff and his wife as to the existence of such pain. This, we think, was error;

and upon the further hearing which we ultimately find necessary, *infra,* the defendant should be permitted to adduce evidence as to the existence, nature, and severity of pain, if any, between the surgery of 1959 and the occurrence of December 30, 1960. The surgeon's opinion should be reevaluated in the light of such evidence.

## IV.

The defendant contends that the Board erred in disregarding the significance and effect of certain answers given by the plaintiff in his application for employment, and in refusing to admit certain proferred evidence addressed to that phase of the case.

In the application form filled out by the plaintiff on September 14, 1959, he wrote "No" to the following questions: "Any physical defect or chronic disease?" and "Have you been confined by illness in past year?"

The defendant argues that the plaintiff thereby misrepresented his physical condition; that the defendant would not have hired the plaintiff if his then-recent back surgery and condition had been disclosed; that if the Board had not barred the evidence, the defendant would have established that it would not have employed the plaintiff if his answers to the questions had more accurately reflected the facts about his health; and that, upon such showing, under the law, the plaintiff would be precluded from receiving the benefits of the Workmen's Compensation Act. The plaintiff responds that the questions on the form were ambiguous; that the answers were true responses to the questions as he understood them; and that the Board properly barred, as immaterial, any evidence of the employment policy of the defendant regarding applicants having physical defects.

We think if manifest, in the light of the plaintiff's undisputed medical history, that his answers were false and misleading. We address ourselves to the consequences of such misrepresentation upon the plaintiff's right to workmen's compensation benefits.

█ It is generally agreed that an employee's false pre-employment statements as to his health may preclude him from receiving workmen's compensation benefits if the misrepresentations go to the factum of the employment contract, or if there is a causal relationship between the misrepresented physical condition and the injury. See 1 Larson's Workmen's Compensation Law, Sec. 47.53; 58 AmJur. "Workmen's Compensation" Sec. 335; Annotation 136 A.L.R. 1124; *Martin Company v. Carpenter,* Fla., 132 So.2d 400 (1961); *Fort Worth & D.C. Ry. Co. v. Griffith,* Tex. Civ.App., 27 S.W.2d 351 (1930); *Clark v. Union Pac. R. Co.,* 70 Idaho 70, 211 P.2d 402 (1949).

The basic problem was considered in *Talarowski v. Pennsylvania R. Co.* (D.Del., 1955) 135 F.Supp. 503, a Federal Employers' Liability Act case, in which the defendant asserted as an affirmative defense that the plaintiff in his application for employment falsified his physical condition; that the falsification was relied upon by the defendant's physican; and that if the defendant knew of the plaintiff's true condition it would not have employed him. In denying the plaintiff's motion to strike the affirmative defense, Judge Wright stated:

"An employee is not entitled to maintain a suit under the provisions of the Federal Employers' Liability Act if his employment is procured by reason of fraudulent statements made in his application for employment, if said fraudulent statements are relied upon and are of such a character as to have been a substantial factor in the hiring. * * *."

The fundamental principle involved was expressed by the United States Supreme Court in Minneapolis, *St. P. & S.S.M. Ry. Co. v. Rock,* 279 U.S. 410, 49 S.Ct. 363, 73 L.Ed. 766 (1929):

"* * * He [the employer] obtained and held his place through fraudulent means. While his physical condition was not a cause of his injuries, it did have direct relation to the propriety of admitting him to such employment. It was at all times his duty to disclose his identity and physical condition to petitioner. His failure so to do was a continuing wrong in the nature of a cheat. The misrepresentation and

injury may not be regarded as unrelated contemporary facts. As a result of his concealment his status was at all times wrongful, a fraud upon the petitioner, and a peril to its patrons and its other employees. Right to recover may not justly or reasonably be rested on a foundation so abhorrent to public policy. * * *."

See also *Southern Pacific Company v. Libbey*, (9 Cir., 1952) 199 F.2d 341; *Long v. Big Horn Const. Co.*, 75 Wyo. 276, 295 P.2d 750 (1956).

We are not aided by an explicit provision of the Workmen's Compensation Act. By implication, however, there is evidence in the Statuate of a public policy regarding an employee's obligation of truthful pre-employment health disclosure to his employer. The second Injury Fund, created by 19 *Del.C.* Sec. 2327,[2] and the apportionment provision of the Act, Sec. 2329 supra, are premised upon an employer's knowledge of an employee's prior injury, disease or infirmity. To enable an employer to resort to these statutory benefits, he must have knowledge of the employee's prior physical condition; and concealment thereof may, unfairly and even fraudulently, deprive an employer of the benefits accorded him by law. Thus, an employee who misrepresents his health in applying for employment not only robs the employer of the freedom of choice he should have in the selection of employees, but also denies him certain valuable rights to which he is entitled under the law.

---

[2] 19 *Del.C.* Sec. 2327 provides as follows:
  "Sec. 2327. Compensation for subsequent permanent injury; special fund for payment
  "Whenever a subsequent permanent injury occurs to an employee who has previously sustained a permanent injury, from any cause, whether in line of employment or otherwise, the employer for whom such injured employee was working at the time of scuh subsequent injury, shall be required to pay only that amount of compensation as would be due for such subsequent injury without regard to the effect of the prior injury. Whenever such subsequent permanent injury in connection with a previous permanent injury results in total disability as defined in section 2326 of this title, the employee shall be paid compensation for such total disability, as provided in section 2324 of this title, during the continuance of total disability; such compensation to be paid out of a special fund know as 'Industrial Accident Board Second Injury Fund".

■ Upon the basis of public policy, the authorities above discussed, and principles of fairness and justice, we hold that an employee forfeits his right to benefits under the Delaware Workmen's Compensation Act if, in applying for employment, the employee (1) knowingly and wilfully made a false representation as to his physical condition; and (2) the employer relied upon the false representation and such reliance was substantial factor in the hiring; and (3) there was a causal connection between the false representation and the injury. Compare *Martin Company v. Carpenter,* supra; *H.J. Jeffries Truck Line v. Grisham,* Okl., 397 P.2d 637 (1964).

■ While, in the instant case, it is clear that the plaintiff's representations as to his health were less than the whole truth, and that there was a causal connection between the misrepresented physical condition and the plaintiff's present physical condition, the record before us does not sufficiently establish that the plaintiff knowingly and wilfully made the misrepresentations, or that the employer's reliance on the false representations was a major factor in its decision to employ the plaintiff. As indicated above, the Board barred the defendant from showing that it would not have hired the plaintiff had he correctly reported his back condition.

Accordingly, by the case must be remanded to the Board for the taking of evidence on these issues, and for the making of findings of fact and conclusions of law in connection therewith, consistent with the foregoing.

### V.

Finally, relying upon *Zallea Brothers v. Cooper,* 3 Storey 168, 166 A.2d 723 (1960), the defendant argues that, in any event, the plaintiff's disability results from an "occupational disease" apportionable under Sec. 2329; that, therefore, the defendant's liability should be limited to the proportion of the disability reasonably attributable to the occurrence of December 30, 1960.

In the Zallea Brothers case, the Superior Court held that any

disability which arises out of, or is aggravated by, particular conditions of employment may be treated as a "compensable occupational disease" within the meaning of our Act. We cannot agree with the breadth of this definition.

The statutory definition of "compensable occupational disease", in 19 *Del.C.* Sec. 2301, leaves the term undefined:

"Compensable occupational disease' includes all occupational diseases arising out of and in the course of employment only when the exposure stated in connection therewith has occurred during the employment and the disability has commenced within 5 months after the termination of such exposure;"

The meaning of the term is further beclouded by its general inclusion within the definition of "injury" in Sec. 2301 as follows:

"'Injury' and 'Personal injury' mean violence to the physical structure of the body, such disease or infection as naturally results directly therefrom when reasonably treated, and compensable occupational diseases arising out of and in the course of the employment;"

Nor is the history of this portion of the Act of much assistance on the question. The evolution of the occupational disease provision of the Delaware Act parallels the development of similar provisions in workmen's compensation laws elsewhere. 1 Larson's Workmen's Compensation Law, Secs. 41.11–41.50. Originally, as enacted in 1918 in 30 Del.Laws, Chap. 203, the Statute made no provision for compensation for occupational disease. In 1937, the Act was amended by 41 Del.Laws, Chap. 241 to provide a schedule of specific compensable occupational diseases.[3] Finally, in 1949, the schedule of

---

[3]The nature of the scheduled diseases may be of some assistance in tracing the trend of legislative thinking:

"Anthrax; Lead Poisoning; Mercury Poisoning; Arsenic Poisoning; Phosphorus Poisoning; Benzene, and its homologues, and all derivatives thereof; Wood Alcohol Poisoning; Chrome Poisoning; Caisson Disease; Mesothorium or radium poisoning; Carbon Disulphide; Hydrogen Sulphide."

specified compensable occupational diseases was abandoned and the general coverage, now appearing in Sec. 2301, was adopted.

As indicated, this evolution of statutory treatment of compensable occupational diseases—from no coverage, to schedule coverage, to general coverage—is not unusual. 1 Larson's Workmen's Compensation Law, Sec. 41.20. In the expansion of occupational disease legislation elsewhere, unlike our lack of definition, varying definitions of the term appear, of different length and detail. There is a common element generally running through the statutory definitions, however: that of the distinctive relation of the disease to the nature of the employment, as contrasted with diseases which might just as readily be contracted in other occupations, or in everyday life, apart from employment. Typical of the statutory definitions elsewhere is the requirement that the disease be "characteristic of", and "perculiar to", the occupation; and that it exclude "all ordinary diseases of life to which the general public are exposed"; and that it be "due to causes in excess of the ordinary hazards of employment as such." When the Statute lacks definition, as in Delaware, it appears that judicial definition, designed to describe the scope of the term, has tended to stress the same elements. 1 Larson's Workmen's Compensation Law, Secs. 41.32, 41.30—42.00.

This court has recently taken the position that the Delaware Workmen's Compensation Act may not be construed so as to be transformed into a health insurance statute. *Faline v. Guido and Francis DeAscanis & Sons*, Del., 192 A.2d 921 (1963). The same admonition has been raised regarding federal compensation acts. *E.g., Grain Handling Co., Inc. v. Sweeney* (2 Cir., 1939) 102 F.2d 464. And New York has adopted the same policy. *Harman v. Republic Aviation Corp.*, 298 N.Y. 285, 82 N.E.2d 785 (1948).

The problem of the proper judicial definition of the undefined term "compensable occupational disease" was met in New York in *Detenbeck V. General Motors Corporation*, 309 N.Y. 558, 132, N.E.2d 840 (1956). That case, too, involved a back injury. The Court of Appeals there held that where a workman's congenital defect of the

spine was agravated in the course of his employment, the resultant disability was not a "compensable occupational disease" if the nature of the employment was not such as to have a tendency to induce a similar disability in an average workman. The Court stated:

"\* \* \* An employee who is physically handicapped may contract an occupational disease more easily because of his weakened condition, but the test of what is an occupational disease is the same whether the employee is decrepit or in normal health. There must be a recognizable link between the disease and some distinctive feature of the claimant's job. This test is not met where disability is caused by an aggravation of a condition which is not occupational in nature. If an employee contracts an occupational disease, he is not to be prejudiced by reason of a pre-existing illness or defect, but neither is he to be perferred over other employees by creating a different class of compensable disabilities for his benefit."

These conclusions were premised upon the earlier statement of the New York Court of Appeals in *Harman v. Republic Aviation Corp.,* supra:

"An ailment does not become an occupational disease simply because it is contracted on the employer's premises. It must be one which is commonly regarded as natural to, inhering in, an incident and concomitant of, the work in question. There must be a recognizable link between the disease and some distinctive feature of the claimant's job, common to all jobs of that sort. \* \* \*."

\* \* \* \* \* \* \* \*

"A contrary decision, approval of the award, would transform workmen's compensation into life and health insurance."

We are in accord with the rationale and resultant definition there enunciated. We hold that a compensable occupational disease, within the meaning of our Act, is one resulting from the peculiar nature of the employment, i.e., from working conditions which produce the disease as a natural incident of the particular occupation,

attaching to that occupation a hazard different from, and in excess of, the hazards attending employment in general. Compare *Goldberg v. 954 Marcy Corp.,* 276 N.Y. 313, 12 N.E.2d 311 (1938).

Manifestly, the plaintiff's disability in the instant case does not come within the above definition. Therefore, it may not be classified as a compensable occupational disease within the meaning of Sec. 2329. Compare *Blake v. Bethlehem Steel Company,* 225 Md. 196, 170 A.2d 204 (1961). Any other decision goes too far, we think, toward a transformation of workmen's compensation into health insurance; and, as we have stated, this would be contrary to settled policy in this State. *Faline v. Guido and Francis DeAscanis & Sons,* supra.

There is this to be said about the line of New Jersey cases relied upon in the Zallea Brothers case: they involved tuberculosis, skin diseases, tendon contracture, and other maladies much closer to the general conception of occupational disease than is a back ailment; they seem to be based upon a broadening of the New Jersey Statute; and it does not appear that the Supreme Court of New Jersey has yet spoken on the subject.

It is concluded on this point that Sec. 2329 has no application in the instant case. The decision of the Board to the contrary must be reversed.

## VI.

Having determined that Sec. 2329 is inapplicable, we have looked at the Second Injury Fund provisions of Sec. 2327 we are of the opinion that Sec. 2327 may be applicable in the present posture of the case, in view of the Board's finding that the injury of December 30, 1960 "aggravated the pre-existing back disability." Since the plaintiff's claim is for total disability, the defendant may be entitled to have compensation paid out of the Second Injury Fund.

Accordingly, the case is remanded to the Board for the further

purpose of hearing evidence, if necessary, and making findings of fact and conclusions of law as to the application of Sec. 2327.

\* \* \*

The judgment below is reversed and the cause remanded to the Board for further proceedings consistent herewith.