**DELAWARE VALLEY FIELD SERVICES, Appellant**

v.

**Saul Melgar RAMIREZ, Appellee**

**CIVIL ACTION NUMBER 12A–01–007–JOH**

Superior Court of Delaware, IN AND FOR NEW CASTLE COUNTY.

Submitted: June 27, 2012
Decided: September 13, 2012

---

Robert H. Richter, Esquire, of Elzufon Austin Tarlov & Mondell, P.A., Wilmington, Delaware, Attorney for Delaware Valley Field Services, Appellant

Arthur M. Krawitz, Esquire, of Doroshow Pasquale Krawitz & Bhaya, Wilmington, Delaware, Attorney Saul Melgar Ramirez, Appellee

## MEMORANDUM OPINION

HERLIHY, Judge

Saul Melgar Ramirez ("Ramirez") was injured on the job in January, 2011. He started to receive total disability benefits. In March 2011, however, he was deported to Honduras and is now excluded from the United States. He had come here as an illegal alien, and at one point in his employment, supplied to his employer a false Social Security number and fraudulently filled out other employment papers indicating he was lawfully here.

The issues presented are of first impression in Delaware law: because Ramirez provided fake documentation and false information to his employer in order to become an employee, is he a covered "employee" under Delaware's Workers' Compensation laws? Does his former illegal status in the United States violate federal law thereby disqualifying him from receiving workers' compensation? Is his now exclusion from the United States tantamount to "incarceration" such that his benefits are suspended or terminated? Does the impossibility of his return to the United States and undergo an employer generated physical exam mean he forfeits his benefits?

The Court holds that his use of false information to become an employee does not remove him from coverage for job related injuries, nor does his illegal status effect his eligibility for benefits. Further, the Court finds his legal inability to return to the United States is not the same as or tantamount to incarceration or any other appropriate statutory basis to suspend or terminate his benefits. Finally, the Court holds that his presence in Honduras does not, at this time, automatically terminate

his benefits due to his legal inability to come to the United States for an employer arranged medical exam. The decision of the Industrial Accident Board granting him benefits and not terminating them is **AFFIRMED**.

### *Factual Background*

There is very little in dispute concerning the facts of this case. Ramirez entered this country unlawfully, has been deported, and is now excluded from the United States. When the Board conducted its hearing on Delaware Valley Field Services' ("DVFS") petition to terminate, he participated by video link. An interpreter sat in the Board hearing room to assist all.[1]

One factual uncertainty, not particularly important to the issues in this case, is when Ramirez began working for DVFS. There may be some confusion on the dates as evidenced by the Board's reference to several dates in its opinion.[2] The record seems to be that Ramirez started to work for DVFS in April 2010, as an "independent contractor," and until January 2011, he was paid in cash. When his status chanted to a payrolled employee of DVFS in January 2011, he did not initially supply any papers. DVFS does "field service" work for mortgage companies, banks and lenders primarily involving repossessed houses. While the record is not as full on the point as it should be, it seems Ramirez did the same kind of work, though not detailed before the Board, for DVFS, while being paid in cash and after becoming a salaried employee.

Raymond Saccomandi, ("Saccomandi") the owner of DVFS, testified about paying Ramirez in cash and later asking him to be an employee. To achieve that status, Saccomandi told Ramirez he had to get him a Social Security number. Also, to become an employee, Ramirez had to fill out or assisted in filling out two other forms. One was a Delaware wage form on which Saccomandi wrote in a false resident alien number. The other form is a federal immigration form, I–9, on which Ramirez supplied false information.

When Saccomondi asked Ramirez to get or supply a Social Security number, Ramirez went to Kennett Square, Pennsylvania, and paid someone $180.00 to get him a false number. In February 2011, the payroll company DVFS uses informed Saccomandi that Ramirez's Social Security number was false. Saccomandi testified he contacted "INS"[3] and learned there were two warrants for Ramirez. No warrants were produced at the Board hearing and they were not otherwise specified. Ramirez was deported to Honduras in March 2011. Saccomondi testified that if he had known Ramirez were an illegal alien and had supplied him with false information and documentation, he would not have hired him.[4]

On January 20, 2011, Saccomondi witnessed Ramirez fall down six steps landing

---

1. *Ramirez v. Del. Valley Field Services*, No. 1363724, at 5, n. 3 (Dec. 20, 2011).

2. *Id.* at 2, n. 1.

3. INS is now Immigration Customs Enforcement ("ICE").

4. In one other area of uncertainty, there was disagreement whether prior to learning Ramirez' Social Security number was false, Saccomondi "knew" Ramirez was not legally in this country. Saccomondi denied that he knew before that. Ramirez testified he knew. Of course, Ramirez was paid in cash for almost a year. He said Saccomondi paid another worker in cash. Like the Board, this Court need not resolve that conflict (it is not the Court's role to resolve conflict in testimony before the Board) in order to determine the legal issues presented. However, as will be noted later—see pages 410–11—paying in cash raises suspicion of knowledge and impli-

on his low back. He reported this incident to his workers' compensation carrier and made arrangements for Ramirez to get medical treatment. Dr. Bruce Rudin, an orthopaedic surgeon, started to treat Ramirez in February, 2011.

The Board summarized Dr. Rudin's medical findings as follows:

Dr. Rudin stated that, on February 21, 2011, Claimant had a grossly antalgic gait with very slow positional changes, extraordinarily limited forward flexion and extension with spasm. An MRI demonstrated a dark disk at L4–5 and a left sided disk herniation at L4–5. Dr. Rudin prescribed Vicodin. A CT scan was performed which demonstrated tranverse process fractures in Claimant's spine (one on the right at L3 and one on the left at L2).

Dr. Ruding saw Claimant again on March 2, 2011. Claimant rated his pain as a nine on a ten-point scale. The doctor recommended an epidural steroid injection. There were no major structural fractures and the fractures Claimant has would typically take six to twelve weeks to heal and resolve that pain. However, in Claimant's case there is also the disk herniation and radicular symptoms (which would not be caused by the tranverse fractures). Because Claimant's treatment with Dr. Rudin was cut short by Claimant's return to Honduras, the doctor was unable to investigate further, but the doctor strongly suspected that Claimant was also having diskogenic pain most likely coming from L4–5. Under the treatment guidelines, if Claimant was no better after four months of conservative care, a discogram would have been performed and surgery would have been considered.

Dr. Rudin was aware that, since his return to Honduras, Claimant had been seeing a family doctor and a neurosurgeon (Dr. Alvarez). Dr. Alvarez is recommending surgery. The proposed surgery was a diskectomy. Dr. Rudin has not seen Claimant since March, but he is not sure that that is the proper approach. If the problem is diskogenic in nature, then a fusion would be the recommended approach.[5]

Dr. Rudin testified Ramirez was totally disabled due to his work injury as of the last time he saw him. The doctor in Honduras, Dr. Rudin noted, also considered Ramirez totally disabled, at least as of August 2011.[6] DVFS presented no medical testimony.

### Board's Decision

In an extremely well written decision, the Board held that, despite Ramirez's illegal status and the supplying of false information and documents, he qualified as an "employee" under the Workers' Compensation Act ("Act"). The Board held that the kind of false information Ramirez supplied was not the kind of false information which would cause forfeiture of benefits since it had nothing to do with his health, work history or any prior injuries.

The Board determined that federal law did not prohibit the award of benefits to an illegal alien. Further, the Board held that Ramirez's illegal status did not render his employment contract void. Ramirez's presence in Honduras and inability to return to the United States for medical treatment or examination does not mean he has forfeited his right to benefits. It is not a refusal to be examined or treated which the Act says operates to forfeit benefits.

---

cates the dangers for workers in Ramirez's position.

**5.** *Ramirez v. Del. Valley Field Services*, No. 1363724, at 4 (Dec. 20, 2011).

**6.** The Board's hearing was on October 21, 2011.

On the issue of Ramirez's deportation and now exclusion, the Board found inapplicable the statutory sections that provide for suspension of benefits when a person is incarcerated. Deportation (exclusion) does not equate to, or include incarceration.

The Board, in conclusion, found that Ramirez's total disability had not ceased and that there were no legal, federal or state, impediments to Ramirez continuing to receive medical benefits. DVFS' petition to terminate was denied.

### Parties' Contentions

DVFS argues that as a matter of law, Ramirez's fraudulent inducement to gain employment rendered his employment void and unenforceable. Ramirez's illegal actions mean he cannot be covered by the Act. DVFS contends the 1986 Immigration Reform and Control Act ("IRCA"), means that since Ramirez could not present valid documents, such as a valid Social Security number/card, he could not be lawfully hired. IRCA, it asserts, preempts the State laws such as Delaware's workers' compensation laws. Further, since Ramirez provided false pre-employment information which led to his hiring and was thereafter injured, he is disqualified from benefits because of his fraudulent inducement.

Since Ramirez was deported, and now excluded, and cannot lawfully return to the United States, his status is tantamount or equivalent to incarceration. Under the Act, a claimant who is incarcerated has his or her benefits suspended. Without explicitly stating, DVFS appears to argue that with Ramirez's permanent exclusion from the United States, his benefits should now be terminated.

In addition to all of the reasons proffered above, DVFS argues Ramirez's inability to return to the United States for a defense medical exam is equivalent to a refusal to undertake such an exam. Such "refusal" means Ramirez has forfeited his benefits. DVFS also contends that it should not have to be put to the expense of sending a doctor from Delaware to Honduras to conduct such an exam or to obtain a doctor there to perform the exam. Either method is unreasonable, it claims.

Ramirez argues he did not fraudulently induce DVFS into employing him as that concept exists under Delaware law. He did not misrepresent his job or health history. In addition, there was no causal connection between the misrepresentation of his status here and the injury. IRCA, he asserts, does not preempt the Act, citing a number of cases from federal and courts in other states. He says the clear trend of those state court opinions is to allow illegal immigrants to recover benefits, even though they obtained their jobs through the same kind of fraud as Ramirez used here. There are, he contends, public policy grounds other courts have found which favor upholding awards.

Further, Ramirez argues, he is not disqualified from receiving benefits because he has not refused a defense medical exam, nor is he incarcerated which, if he were, would cause suspension of benefits.

### Standard of Review

▆▆▆ On an appeal from the Board, this Court's role is to determine whether there is substantial evidence in the record to support the Board's findings[7] and is free from legal error.[8] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

---

7. *State v. Dalton*, 878 A.2d 451, 456 (Del. 2005).

8. *General Motors Corp. v. Jarrell*, 493 A.2d 978, 980 (Del. Super. 1985).

support a conclusion.[9] The Board, not the Court, determines the credibility of witnesses.[10] Where, as was the case here for portions of the Board's rulings, there is interpretation of a statute, the Court's review is plenary.[11]

## Discussion

### A

### Total Disability Status

The Board's decision reflects only one factual finding, which DVFS does not challenge in this appeal. Instead, its argument rests on the legal issues involved in disqualifying Ramirez. The factual finding which it does not dispute now or before the Board is that Ramirez is totally disabled. Dr. Rudin testified Ramirez was totally disabled, though he had not seen him in a while. Additionally, the evidence from the doctor in Honduras confirms that Ramirez is totally disabled. DVFS presented no evidence to rebut this testimony. Thus, the medical testimony before the Board constitutes substantial evidence that Ramirez remains totally disabled.

### B

### Ramirez's Status As An Illegal Alien

■ DVFS advances three arguments that Ramirez's illegal alien status in this country disqualifies him from any benefits.

The first is that because of his illegal status employment with DVFS at the time of the injury, there cannot be a valid, enforceable employment contract with DVFS. This argument raises several sub-issues, the primary one of which is statutory construction, but also one of public policy.

■ When interpreting a statute, the Court's role is to give effect to the legislature's intent.[12] Where a statute is unambiguous and there is no reasonable doubt about its meaning, the Court must give effect to the literal meaning.[13] If uncertainty exists about statutory language, the statute must be viewed as a whole to harmonize it.[14] Specifically, as to Delaware's Workers' Compensation laws, they are to be liberally construed to accomplish their purposes.[15] Those purposes, traditionally, have been stated to be prompt payment for work related injuries without regard to fault and relieve employees and employers of the burden of civil litigation.[16]

The analysis here begins with the statutory definition of employee:

"Employee" means every person in service of any corporation (private, public, municipal or quasi-public), association, firm or person, excepting those employees excluded by this subchapter, under any contract of hire, express or implied, oral or written, or performing services for valuable consideration. . . . [17]

9. *Turbitt v. Blue Hen Lines, Inc.*, 711 A.2d 1214, 1215 (Del. 1998).

10. *Lemmon v. Northwood Constr.*, 690 A.2d 912, 914 (Del. 1996).

11. *Public Water Supply Co. v. DiPasquale*, 735 A.2d 378, 381 (Del. 1999).

12. *Richardson v. Wile*, 535 A.2d 1346, 1348 (Del. 1988).

13. *Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 217 (Del. 1993).

14. *Watson v. Burgan*, 610 A.2d 1364, 1368 (Del. 1992).

15. *Children's Bureau of Del. v. Nissen*, 29 A.2d 603, 609 (Del. Super. 1942).

16. *Champlain Cable Corp. v. Mutual Liability Ins. Co. Of Wis.*, 479 A.2d 835, 840 (Del. 1984).

17. 19 *Del. C.* § 2301(10).

This definition says nothing about legal aliens, illegal aliens or anything else along those lines. On its face, therefore, Ramirez falls within that statutory definition. Compare, for instance, the definition (at one time) in Ohio for "employee" which provided "including aliens."[18] Michigan has similar language in its definition of employee which states, "including aliens."[19] In both situations, those statutory definitions, not differentiating between legal or illegal aliens, meant the illegal aliens were entitled to workers' compensation benefits.

Delaware's law has no such language. Except as just noted about Ohio and Michigan, other states' laws do not address the issue of aliens within their definitions of "employee." The purposes of their workers' compensation laws are basically identical to those of Delaware's.[20] Like Delaware,[21] other states' laws provide that workers' compensation is the exclusive remedy for injured workers.

The point is, therefore, with similar laws and goals, the analysis undertaken by other courts with the same issues now raised here, provides persuasive reasoning. For instance, the District of Columbia Court of Appeals in *Asylum Co. v. District of Columbia Dep't of Employment Services*, held that an illegal alien injured on the job was an employee within the District's definition of employee.[22] The Court used several reasons to reach that result: the broad statutory definition of employee, and that aliens were not excluded in the definition.[23] Another reason which the *Asylum* Court gave is one which is subsumed in Delaware's law, but has not been explicitly stated as a purpose, until now, as far as is known. It is that workers' compensation laws also have a goal of encouraging employers to foster a workplace safe for all workers.[24]

In reaching its conclusions, the *Asylum* Court relied heavily on the reasoning of the Connecticut Supreme Court's decision in *Dowling v. Slotnik*.[25] In *Dowling*, the claimant was an illegal alien.[26] Connecticut's definition of "employee," like Delaware's, makes no mention of aliens, legal or illegal.[27] One reason the *Dowling* Court found that an illegal alien was an employee is that the definition says "any person."[28] Further, the court said the definition's juxtaposition of "any person" with specific exclusions of categories of people from being "employees" suggested that the legislature did not intend to exclude aliens.[29]

Identical reasoning, perhaps stronger, can be utilized when examining Delaware's "employee" definition. That stronger reasoning starts with the first few words of the definition, which states that, "[e]mployee means *every person* . . . ."[30] The definition of "every" as applicable to this issue

---

18. *Rajeh v. Steel City Corp.*, 157 Ohio App.3d 722, 813 N.E.2d 697, 700 (2004).

19. *Sanchez v. Eagle Alloy, Inc.*, 254 Mich.App. 651, 658 N.W.2d 510, 514 (2003).

20. *Champlain Cable Corp.*, 479 A.2d at 840.

21. 19 *Del. C.* § 2304.

22. 10 A.3d 619, 629 (D.C. 2010).

23. *Id.* at 626.

24. *Id.* at 628.

25. 244 Conn. 781, 712 A.2d 396 (1998).

26. *Id.* at 399.

27. *Id.* at 407.

28. *Id.*

29. *Id.*

30. 19 *Del. C.* § 2301(10) (emphasis added).

is, "[b]eing each individual or part of a group without exception." [31]

There being no exception, therefore, within the word every, illegal aliens are not excepted. Another aspect of the *Dowling* Court's reasoning applies to the issue here. The definitions of "employee" in both states starts broadly, but each has some narrow categories of persons who are explicitly excepted. The *Dowling* Court found that placement to mean since aliens, legal or illegal, were not specifically excepted, they are included in the definition of employee. Delaware, like Connecticut, has specific exceptions of categories of persons in its otherwise broad definition of employee, meaning "every person." They include spouse and minor children of a farm employer, casual not regular workers, among others. Since the legislature specifically listed those persons who are not to be "employees" under the Act, it is presumed it chose not to also exclude aliens—legal or illegal. [32]

The issues of illegal immigrants, undocumented workers, having jobs, etc., have been prominent on the national issues plate for years. Delaware is no exception. It would be naive of this Court to believe our General Assembly, being fully attuned to all of the furor over these issues would not have seen fit to amend the definition of employee to exclude illegal aliens, if it believed they should be excluded from the definition of "employee." [33]

In addition to *Asylum* and *Dowling*, other courts have reached the same result that their states' laws did not preclude illegal aliens from receiving workers' compensation. [34]

■ The *Dowling* Court addressed another issue which DVFS raises. It is that any employment agreement with Ramirez is void *per se* because of his illegal status. In *Dowling*, the court held that the taint of illegality was not so much as a matter of law, as to make the agreement void, or to remove the employee from the protection of the Connecticut Workers' Compensation Act. [35]

In this Court's view, to void such contracts (be they verbal or written) which could remove employees who have them from under the umbrella of the Act, creates an interesting, if not absurd anomaly. An illegal alien, for instance, injured in a non-work-related auto accident has the right to sue and recover from the tortfeasor regardless of his or her illegal status. Since the Act's remedies are exclusive and should the employment contract be void, and he or she were injured on the job, what would be the alien's remedies? Might he or she then have a common law right to sue his or her employer? If so, the illegal alien would enjoy benefits unavailable to an employee who is a U.S. Citizen or legal alien such as recovery of 100% of lost wages not the 66 2/3% provided under the Act. [36] That's the absurd result which courts are to avoid in construing statutes and examining the effects of their

**31.** Webster's New Collegiate Dictionary 430 (9th ed. 1988).

**32.** *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982).

**33.** The Court leaves aside any constitutional issues which may or may not arise from doing so.

**34.** See e.g., *Reinforced Earth Co. v. Workers' Compensation Appeal Board*, 570 Pa. 464, 810

A.2d 99, 105 (2002); *Safeharbor Employer Services I, Inc. v. Velazquez*, 860 So.2d 984, 986 (Fla. Dist. Ct. App. 2003).

**35.** *Dowling*, 712 A.2d at 409-410; *Accord Dynasty Sample Co. v. Beltran*, 224 Ga.App. 90, 479 S.E.2d 773, 775 (1996).

**36.** 19 *Del. C.* §§ 2324–2325.

construction.[37] The employment agreement between DVFS and Ramirez is not void, at least that it operates to disqualify Ramirez from receiving workers' compensation benefits.

▮ When deciding the issue of whether illegal aliens are employees under their state laws, the same courts had to confront the issue of whether that result violated the Immigration Reform and Control Act, IRCA. A number of courts have exhaustively discussed the interplay of their jurisdiction's workers' compensation laws and IRCA. Their opinions are well-reasoned and all each the same result: IRCA does not bar illegal aliens from receiving workers' compensation benefits. This Court turns again to the *Dowling* Court's comprehensive analysis which so articulately explains why IRCA does not preempt workers' compensation laws:

> We begin with a brief overview of the purpose and relevant provisions of the Immigration Reform Act. "The [Immigration Reform Act] constituted a major ... response to the vast tide of illegal immigrants that had produced a 'shadow population' of literally millions of undocumented aliens in the United States." The Immigration Reform Act sought to reduce the flow of illegal immigrants into the United States by removing the unemployment "magnet" that draws undocumented aliens into the country. The goal of the Immigration Reform Act was "to reduce the incentives for employers to hire illegal aliens."
>
> Consistent with these goals, the Immigration Reform Act makes it unlawful knowingly to employ unauthorized workers. 8 U.S.C. § 1324a(a). Employers are required to verify that each of their employees is authorized to work in the United States and to complete an em-

ployment eligibility verification form, attesting that the employer has examined certain types of documents and has verified that the potential employee is not an unauthorized alien. 8 U.S.C. § 1324a(b). Civil fines may be imposed on an employer who violates the verification requirements or knowingly employs an unauthorized alien. 8 U.S.C. § 1324a(e)(4) and (5). A pattern or practice of knowingly employing unauthorized aliens may result in the infliction of criminal punishment. 8 U.S.C. § 1324a(f). In addition, the Immigration Reform Act provides that *"[t]he provisions of [§ 1324a] preempt any State or local law imposing civil or criminal sanctions ... upon those who employ ... unauthorized aliens."* 8 U.S.C. § 1324a(h)(2).

"The question of preemption is one of federal law, arising under the supremacy clause of the United States constitution....Determining whether Congress has exercised its power to preempt state law is a question of legislative intent." Preemption may be express or implied. "Express preemption occurs to the extent that a federal statute expressly directs that state law be ousted to some degree from a certain field.... Even where there is no express statutory statement ousting state law from a given area, [however] there may be implied preemption." "The United States Supreme Court has instructed us that, absent an explicit statement that Congress intends to preempt state law, courts should infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law, or where the state law at issue conflicts with federal law, either because it is

---

**37.** *See E.I. Du Pont de Nemours & Co. v. Clark*, 88 A.2d 436, 438 (Del. 1952).

impossible to comply with both, or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives.

\* \* \* \* \*

We turn first to the respondents' claim that the Immigration Reform Act expressly preempts the commissioner from awarding workers' compensation benefits to undocumented aliens. Section 1324a(h)(2), the express preemption provision of the Immigration Reform Act, only prohibits the states from imposing civil *sanctions* upon those who employ undocumented aliens. Because workers' compensation benefits are designed " 'to *compensate the worker for injuries* arising out of an in the course of employment, *without regard to fault,* by imposing a form of strict liability on the employer' "; an award of such benefits reasonably cannot be described as a "sanction."

Moreover, even if we assume, arguendo, that workers' compensation benefits somehow do constitute "sanction" rather than a compensatory remedy, the respondents' argument that § 1324a(h)(2) proscribes awards of workers' compensation benefits to illegal aliens is still unpersuasive. Section 1324a(h)(2) does not preempt the states from imposing any civil sanction *whatsoever* upon a person who employs an undocumented alien. Rather, the Immigration Reform Act expressly preempts the states from sanctioning an employer only *for employing an undocumented alien.* To construe the express preemption provision of the Immigration Reform Act otherwise would result in state and local officials being unable to impose even a traffic fine upon a person who has employed an undocumented alien, an obviously absurd result. Accordingly, in order for an award of compensation benefits to an undocumented alien

to fall within the purview of § 1324a(h)(2), the benefits must have been awarded *because the employee was an illegal alien.* The respondents, however, do not contend that the legislature intended that an award of workers' compensation benefits serve as a means of penalizing employers *for employing undocumented aliens,* nor do they claim that the commissioner awarded benefits to the claimant in order to sanction the respondents *for hiring the claimant,* and nothing in the record even suggests that was the case. We conclude, therefore, that the commissioner's award of workers' compensation benefits to the claimant does not constitute a civil sanction that is preempted by § 1324a(h), the express preemption provision of the Immigration Reform Act.

The respondents also maintain that to the extent that the Workers' Compensation Act authorizes the commissioner to award benefits to undocumented aliens, the Workers' Compensation Act *impliedly* is preempted by the Immigration Reform Act. "[A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively ... or when state law is in actual conflict with federal law. [The United States Supreme Court has] found implied conflict pre-emption where it is impossible for a private party to comply with both state and federal requirements ... or where state law stands as an obstacle to the accomplishment and execution of the purposes and objectives of Congress." The respondents do not claim that the Immigration Reform Act was intended to "occupy [the] field" or that it is impossible for employers to comply with the requirements of both the Immigration Reform

Act and the Workers' Compensation Act, but argue instead that providing workers' compensation benefits to an undocumented alien would contravene the purpose of the Immigration Reform Act. "[T]here is a strong presumption against federal pre-emption of state and local legislation." This presumption is especially strong in areas traditionally occupied by the states, such as public health and safety. Consideration of issues arising under the supremacy clause " 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the *clear and manifest* purpose of Congress.' "

The primary purpose of the Immigration Reform Act was to establish procedures that make it more difficult to employ undocumented workers and to punish employers who knowingly offer jobs to those workers. The Immigration Reform Act itself gives no indication that Congress intended the act to preempt state laws whenever state laws operate to benefit undocumented aliens. Indeed, "it is clear from [the] legislative history [if the Immigration Reform Act] that Congress anticipated some conflict between the new statute and ... various state ... statutes....As explained in the House Report: 'It is not the intention of the Committee that the employer sanctions provisions of the bill be used to undermine or diminish in any way labor protections in existing law....' " "[I]n an effort not to exacerbate the appeal of illegal workers to unscrupulous employers, [the Immigration Reform Act] ... does not reduce the legal protections and *remedies* for undocumented workers under other laws."

Furthermore, there is no merit to the respondents' argument that providing workers' compensation benefits to undocumented aliens would stand as an obstacle to "removing the employment 'magnet' that draws undocumented aliens into the country." Potential eligibility for workers' compensation benefits in the event of a work-related injury realistically cannot be described as an incentive for undocumented aliens to enter this country illegally. More important, excluding such workers from the pool of eligible employees would relieve employers from the obligation of obtaining workers' compensation coverage for such employees and thereby contravene the purpose of the Immigration Reform Act by creating a financial incentive for unscrupulous employers to hire undocumented workers. See Conn. Joint Standing Committee Hearings, Judiciary, 1913 Sess., p. 124, remarks of Professor Willard C. Fisher ("[u]nless the employer is required to pay the same [insurance premium for all workers] ... he is ... under inducement to take on [uncovered workers] ... [the Workers' Compensation Act] must not ... exclude aliens form the benefits; because there would be precisely the same inducement under such a provision for an employer to take on the men who are not citizens of the country"); *Mendoza v. Monmouth Recycling Corp.*, 288 N.J.Super. 240, 247, 672 A.2d 221 (1996) ("immunity from accountability [under Workers' Compensation Act] might well have the further undesirable effect of encouraging employers to hire illegal aliens in contravention of the provisions and policies [of the Immigration Reform Act]"); *Montoya v. Gateway Ins. Co.*, 168 N.J.Super. 100, 104, 401 A.2d 1102 (1979) (potential employers may be encouraged to employ illegal aliens if such aliens are unable to lodge claims based on injuries sustained); See also *Sure–Tan, Inc. v. National Labor Relations Board*, 467 U.S. 883, 893, 104 S.Ct. 2803,

81 L.Ed.2d 732 (1984) (excluding illegal aliens from purview of National Labor Relations Act would provide incentive for employers to hire such workers); *Patel v. Quality Inn South,* supra, 846 F.2d [700] at 704 [ (11th Cir.1988) ] (excluding illegal aliens from purview of Fair Labor Standards Act would provide incentive for employers to hire such workers).

The respondents have failed to establish that Congress intended the Immigration Reform Act to preempt state laws that benefit undocumented aliens, nor have they demonstrated that including undocumented aliens in the pool of employees potentially eligible to receive state workers' compensation benefits would result in "clear and manifest" damage; to the goal Congress sought to attain when it enacted the Immigration Reform Act. We conclude, therefore, that the Immigration Reform Act does not preempt, either expressly or impliedly, the authority of the states to award workers' compensation benefits to undocumented aliens.[38]

Subsequent to the *Dowling* decision, the United States Supreme Court decided. *Hoffman Plastic Compounds, Inc. v. NLRB.*[39]

In that case, the Supreme Court decided that IRCA barred the NLRB form awarding back pay to an undocumented alien who had never been authorized to work in the United States.[40] The unauthorized worker had been laid off for his union activity and the back pay, which the NLRB awarded, was pursuant to the National Labor Relation Act.[41]

The holding in *Hoffman* then spurred a re-examination of IRCA's effect on benefits under workers' compensation laws.

The Second Circuit in *Madiera v. Affordable Housing Foundation, Inc.,*[42] found that *Hoffman Plastic* neither explicitly or generally meant that IRCA preempted New York's workers' compensation laws, including an award for lost earnings.[43] Most recently, in *Asylum,* the court held that IRCA did not preempt the District of Columbia's workers' compensation laws.[44] Tellingly, the Court explained why:

> Further, we do not believe that payment of wage-loss benefits to claimants who are undocumented aliens "stands as an obstacle to the accomplishment and execution of the full purposes and objecti[ves] of Congress" in passing IRCA. Through IRCA, Congress sought to "reduce the flow of illegal immigration into the United States by removing the employment 'magnet' that draws undocumented aliens into the country," and to deter employment of undocumented aliens. We think it unlikely that the availability of workers' compensation benefits in the United States would significantly affect an alien worker's decision about whether to enter this country in response to the already "magnetic" force of the job market. Conversely, as many courts have concluded, denying compensation coverage to undocumented

---

**38.** *Dowling,* 712 A.2d at 401–05 (citations omitted).

**39.** 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002).

**40.** *Id.* at 151, 122 S.Ct. 1275.

**41.** *Id.* at 140, 152, 122 S.Ct. 1275.

**42.** 469 F.3d 219 (2d Cir. 2006).

**43.** *Id.* at 240. See 245 n. 26, in which the court lists many state court decisions finding *Hoffman Plastic* did not mandate preemption of workers' compensation laws.

**44.** *Asylum,* 10 A.3d at 633.

aliens "creates powerful incentives for employers to hire such individuals." 3 Lex K. Larson, *Larson's Workers' Compensation Law* § 6603[3][c] (Rev. Ed. 2010). "[S]tate courts have almost uniformly held that workers' compensation awards are not an obstacle to the accomplishment and execution of the policy and purposes of IRCA" and "have generally concluded that uniform application of workers' compensation laws best serves the interests of both federal and state law." [45]

This Court joins *Dowling, Madeira, Asylum,* and other courts which have found that IRCA has not preempted state workers' compensation laws and finds that it does not preempt Delaware's Act.

■ · DVFS argues, nonetheless, that, but for Ramirez's fraud in obtaining a Social Security number and falsifying the information on the forms he filled out for DVFS, he would not have been injured. That is based on Saccomandi's testimony that had he known the information was false, he would not have hired Ramirez. If he had not hired Ramirez, he would, therefore, never been on the job to be injured.

This argument is a hoped-for logical leap from the holding in *Air Mod Corp. v. Newton*.[46] In that case, the claimant suffered a back injury in 1937 and applied for a new job in 1959, but he did not divulge the prior injury on the 1959 application.[47] The Supreme Court found this to be false and misleading.[48] The Supreme Court held that an employee would forfeit benefits if, when applying for a job, the employee: "(1) knowingly and wilfully made a

false representation as to his physical condition; and (2) the employer relied upon the false representation and such reliance was a substantial factor in the hiring; and (3) there was a causal connection between the false representation and the injury." [49]

DVFS' proposal to apply these tests to this case is a causal leap too far. Of course, there is no doubt that Ramirez willfully and knowingly made a false representation about his status in the United States. However, there was no statement, false or otherwise, of physical condition, or lack thereof, on the information Ramirez supplied. There simply is no issue of a prior physical condition in this case. DVFS did not rely upon any information or lack of information about a prior physical condition to any extent when hiring Ramirez as an employee. Finally, there clearly was no causal connection between the representation of physical status and the back injury Ramirez suffered. The *Air Mod* tests have nothing to do with this situation.

Other courts which have tests similar to *Air Mod* to determine possible forfeiture have considered what tests may be utilized where an employee has lied about his immigration status. Of particular note to this Court is the Virginia Supreme Court's opinion in *Granados v. Windson Dev. Corp.*[50] The claimant, an illegal immigrant, when hired, forged a Social Security card and an INS card with his picture indicating he was a resident alien.[51] He also signed a document saying he was lawfully admitted.[52] This, too, was false.[53] He was

---

**45.** *Id.* (citations omitted).

**46.** 215 A.2d 434 (Del. 1965).

**47.** *Id.* at 436–37.

**48.** *Id.*

**49.** *Id.*

**50.** 257 Va. 103, 509 S.E.2d 290 (1999).

**51.** *Id.* at 291.

**52.** *Id.*

injured on the job.[54] His employer, as here, said he would not have hired Granados if he knew all the information were false.[55]

Virginia's version of the *Air Mod* tests relating to a potential bar of benefits is: "(1) the employee intentionally made a material false representation; (2) the employee relied on that misrepresentation; (3) the employer's reliance resulted in the consequent injury; and (4) there is a causal relationship between the injury and issue and the misrepresentation."[56] The Virginia Supreme Court held that Granados' injury was unrelated to his misrepresentation about his immigration and eligibility for employment.[57]

The Court of Appeals in Georgia reached the same result in a case involving an illegal alien injured on the job.[58]

Ramirez's fraudulent inducement is, and was not causally related to his subsequent injury.

### C

■ DVFS contends that Ramirez's deportation, now exclusion, operates to cause his benefits to be suspended, if not terminated, since he cannot return to the United States. It equates his excluded status in Honduras to being incarcerated. The basis for that argument is found in 19 *Del. C.* § 2353(d). That section provides that various kinds of benefits, such as what Ramirez is receiving, may be suspended for as long as one of three conditions apply: (1) the employee is incarcerated by the State of Delaware after an adjudication of guilt; or (2) the employee is incarcerated in another state or other government subdivision of another state authorized to operate a penal facility after adjudication of guilt; or (3) the employee is incarcerated by the federal government, after an adjudication of guilt.[59]

DVFS' contention again implicates this Court's role in interpreting statutes. Subsection (d) which specifies three circumstances where benefits may be suspended was added in a 2007 amendment.[60] Prior to then, there was no equivalent provision for suspending benefits. There were, and are others, but none relating to this discrete issue.

As has been noted earlier, illegal immigration has been a hot button issue for a number of years and long before this incarceration "suspension" provision was added to the Code in 2007. Yet, the General Assembly chose not to add language to suspend or terminate an illegal immigrant's benefits on that sole basis or on his or her excluded status. Also, when examining the Act as a whole, there is no provision in it directly addressing the illegal immigrant issue.

To add by judicial fiat a further basis for suspension or termination of benefits premised on exclusion from the United States, would be rank judicial usurpation of the power exclusively vested in the Legislature. This Court declines to do that. This Court must and can reasonably assume the General Assembly is aware of the myriad issues swirling around illegal immigrants. From that, too, the Court

53. *Id.*

54. *Id.*

55. *Id.*

56. *Granados,* 509 S.E.2d at 292.

57. *Id.*

58. *Dynasty Sample Co. v. Beltran,* 224 Ga. App. 90, 479 S.E.2d 773 (1996).

59. 19 *Del. C.* § 2353(d).

60. 76 Del. Laws ch. 1 (2007).

can deduce, the Legislature's silence, especially in 2006 when the amendment to § 2353 was passed, could readily mean it chose not to add an exclusion due to deportation/exclusion to the list of disqualifications or reasons for suspension of benefits.

In addition, Ramirez is not in jail in Honduras. He was able to go to a place where he could participate in the hearing and he has been able to see a local physician. Additionally, his status as an excluded person after deportation is not equivalent to a finding of guilt.

The Court of Appeals of Ohio in *Rajeh v. Steel City Corp.*,[61] found that a former employee's presence, due to exclusion, in a foreign country, did not disqualify him from receiving benefits.[62] By case law, apparently, Ohio suspends benefits for incarcerated persons,[63] but Delaware's exclusion is by statute. One important policy reason which the Ohio court gave is that a purpose of workers' compensation laws is to promote a safe, injury-free workplace.[64] Because of the cost to employers for not doing so is higher, employers have an incentive to provide such work environment.[65] Excluding illegal aliens from collecting workers' compensation, the Ohio court said, reduces the risk that "underhanded employers might be prone to hire illegal aliens." [66] There is more involved. Many such persons may be paid below the minimum wage; employers, by paying cash instead, avoid FICA withholding and other employer responsibilities. Federal and state governments do not get the tax revenues they should.

Ramirez's exclusion from the United States does not itself necessitate the suspension or termination of his benefits.

## D

 DVFS sought to terminate Ramirez' benefits because he refuses to submit to an employer medical evaluation, invoking 19 *Del. C.* § 2343.

(a) After an injury, and during the period of resulting disability, the employee, if so requested by the employee's employer or ordered by the Board, shall submit the employee's own self for examination at reasonable times and places and as often as reasonably requested to a physician legally authorized to practice the physician's profession under the laws of such place, who shall be selected and paid by the employer. Such medical examination shall not be referred to as an "Independent Medical Examination" or "IME" in any proceeding or on any document relating to a matter under this chapter; nor shall any examination, required by the employer, by any other doctor, who is an employee of an insurance company, or who is paid by an insurance company, or who is under contract to an insurance company, be referred to as an "Independent Medical Examination" or "IME." If the employee requests, the employee shall be entitled to have a physician, qualified as specified in this section, of the employee's own selection, to be paid by the employee, present to participate in such examination. For all examinations after the first, the employer shall pay the reasonable traveling expenses and loss

61. 157 Ohio App.3d 722, 813 N.E.2d 697 (2004).

62. *Id.* at 703.

63. *Id.*

64. *Id.*

65. *Id.*

66. *Id.*

of wages incurred by the employee in order to submit to such examination. The Board may impose a fine not to exceed $500 for each use of the term "Independent Medical Exam" or "IME" in violation of this subsection.

(b) The refusal of the employee to submit to the examination required by subsection (a) of this section or the employee's obstruction of such examination shall deprive the employee of the right to compensation under this chapter during the continuance of such refusal or obstruction and the period of such refusal or obstruction shall be deducted from the period during which compensation would otherwise be payable.

(c) No fact communicated to or otherwise learned by any physician or surgeon who has attended or examined the employee or who has been present at any examination shall be privileged either in the hearings provided for in this chapter or in any action at law.[67]

The Court disagrees with the Board's reasoning in rejecting DVFS' contention that there has been a refusal.

The uncontradicted record before the Board and the Court is that there has not been a refusal. DVFS offers only the following hypotheticals: (1) the unstated, unproven cost and reasonableness of flying its own doctor to Honduras; and (2) unsubstantiated difficulty in finding a doctor in Honduras to do the medical exam.

Two doctors, Dr. Rudin and Dr. Alvarez, indicate Ramirez is totally disabled.

DVFS offered no contrary medical testimony to the Board, even based on the records it has from Dr. Rudin and made no apparent effort to obtain records from Dr. Alvarez. It offered no testimony about the cost of sending a doctor of its choosing to Honduras, or any testimony about any effort to try to find a doctor there to conduct a true independent medical exam.

Most importantly, DVFS did not show the Board that Ramirez refused to be seen by either an American or a Honduran doctor of its choosing, which, of course, must be in Honduras. It would be insufficient for DVFS to only ask if he were willing to see a doctor there without establishing an effort to supply the missing evidence discussed above and other factors reflecting on reasonableness.

In sum, there is no refusal and, therefore, Ramirez benefits are not terminated for that reason either.

### Conclusion

For the reasons stated herein, the decision of the Industrial Accident Board is **AFFIRMED**.

**IT IS SO ORDERED**.

---

**67.** 19 *Del. C.* § 2343.