IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CARL FOWLER, | § | |
| | § | |
| | § | |
| Claimant Below, | § | No. 412, 2023 |
| Appellant, | § | |
| | § | |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| | § | |
| PERDUE, INC., | § | |
| | § | |
| | § | |
| Employer Below, | § | C.A. No. K23A-01-001 |
| Appellee. | § | |

Submitted: April 17, 2024
Decided: June 24, 2024

Before **VALIHURA, TRAYNOR**, and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Walt F. Schmittinger, Esquire, Schmittinger and Rodriguez, P.A., Dover, Delaware, *for Appellant*.

Andrea C. Panico, Esquire, Megan E. Murray, Esquire, Tybout, Redfearn & Pell, Wilmington, Delaware, *for Appellee*.

**VALIHURA**, Justice:

## I. INTRODUCTION

Claimant-Below Appellant Carl Fowler ("Fowler") appeals from a Superior Court decision affirming a post-hearing denial of compensation by the Industrial Accident Board of the State of Delaware ("I.A.B."). Following an earlier reversal and remand from the Superior Court, the I.A.B. determined that Fowler had developed COVID-19 while working at Perdue, Inc. ("Perdue"), and that Fowler had failed to present sufficient evidence that COVID-19 was a compensable occupational disease. The Superior Court affirmed that decision. For the following reasons, we AFFIRM the judgment of the Superior Court.

## II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. Underlying Facts[1]

Fowler worked at Perdue from January 2020 until late March 2020.[2] Throughout the month of March 2020, Fowler worked his usual night shifts at Perdue in the box area. His shift was from 5:50 p.m. until sometime between 3:00 a.m. and 6:00 a.m. in the morning. Most days, he received a thirty-minute meal break.[3] The box room was L-shaped

---

[1] Unless otherwise noted, the facts are derived from the two I.A.B. opinions, except for those facts that were rejected by the Superior Court during its first review of the case. *Fowler v. Perdue Inc.*, No. 1501167 (Del. I.A.B. Dec. 17, 2020) [hereinafter "I.A.B. I at _" in footnotes and "First I.A.B. Decision" in text]; *Fowler v. Perdue Inc.*, No. 1501167 (Del. I.A.B. Dec. 12, 2022) [hereinafter "I.A.B. II at _" in footnotes and "Second I.A.B. Decision" in text]. The Superior Court reversed the First I.A.B. Decision in *Fowler v. Perdue Farms, Inc.*, 2022 WL 807327 (Del. Super. 2022) [hereinafter "*Fowler I*"]. The Superior Court Decision affirming the Second I.A.B. Decision is *Fowler v. Perdue Farms, Inc.*, 2023 WL 6888918 (Del. Super. 2023) [hereinafter "*Fowler II*"].

[2] I.A.B. I at 13. Fowler never returned to work.

[3] *Id*. at 14. If Fowler worked sufficient overtime, he received another break.

and was about eighty feet long and fifty feet wide.[4]  Four or five employees worked on Fowler's shift, and they were spaced six to eight feet apart.  There were more than 1,400 employees at the Milford Perdue plant, and 650 of those employees worked the nightshift.

Fowler typically packed his own lunch and took his lunch break in Perdue's lunchroom.[5]  He testified that there would be about 200 people in the lunchroom, sitting close "[l]ike a sardine can[.]"[6]  Ronald Dukes, the Safety and Security Manager at Perdue, testified that if the cafeteria were full, it held 150 to 170 people.  Dukes did not agree that employees were seated shoulder to shoulder.  The chairs were movable, and the tables, measuring three feet by eight feet, were placed end-to-end.

On March 12, 2020, the Governor of Delaware issued a State of Emergency, closed the public schools, and required Delawareans to shelter in place.  Perdue increased housekeeping service protocols and increased the number of janitorial staff to clean high touch surfaces every two hours.

On March 16, 2020, Fowler attended a routine check-up with his doctor, Dr. Barrington Brown.[7]  Fowler reported feeling well, sleeping well, having good energy levels, and he had no new complaints.[8]

---

[4] *Id*. at 18.  The room is a dry area and contains packaging materials, cardboard, and lids.

[5] *Id*. at 14.  Fowler testified that he always packed his lunch.  His wife testified that he usually packed his lunch, but occasionally purchased it.  *Id*. at 17.

[6] *Fowler I*, at *1 (quoting Carl Fowler I.A.B. Hearing Testimony on Nov. 17, 2020 at 79:1–2); *Fowler II*, at *2.

[7] I.A.B. II at 3.  This was a relevant contact within the period in which Fowler could have been exposed to and contracted COVID-19.  *Id.* at 8.  But it was a much lower risk in comparison to the cafeteria at Perdue.  *Id.*

[8] I.A.B. I at 3.  Fowler had a cardiac assist device implanted years before the events of this case.

On March 17 or 18, 2020, Perdue developed a "Call to Action" form and posted it on its safety bulletin board. It listed instructions about handwashing, avoiding touching one's face, and keeping a safe distance from sick people. On March 18, the first employee exhibiting COVID-19 symptoms was sent home. That employee was tested on March 26, 2020, and Perdue was notified on March 31 that the test was positive.

Fowler reported to Dr. Alfred E. Bacon, III, M.D., Perdue's expert, that he was not aware of anyone at Perdue who had COVID-19. March 24, 2020 is the earliest date that Dukes was aware that employees tested for COVID-19. On March 24, Perdue removed chairs and staggered tables in the cafeteria. Dukes testified that when the chairs were removed in the cafeteria, people were separated by eight to ten feet. On March 25, Perdue began daily cleaning and sanitizing with a fogging machine. March 28 is the earliest date that a Perdue employee tested positive. Between March 28 and April 8, twenty-four Perdue employees tested positive for COVID-19. Between March 18 and April 15, 124 employees were taken out of work and all of them later tested positive for COVID-19. Fowler was the only employee from the box room's night shift to test positive.

On March 29, 2020, Fowler went to the Bayhealth Medical Center emergency room. He reported a "dry cough, fever of 100.7 to 100.9, chest tightness, and restlessness for two days associated with shortness of breath."[9] Fowler was tested in the emergency room for COVID-19, but the test results were not immediately available. A note in the file indicated that Fowler was at a "'high risk for possible underlying COVID-19 infection given that he

___

[9] *Id.* at 7.

4

is still working at Perdue factory over the last two weeks.'"[10]  Dr. Brown stated that the emergency room was aware of an outbreak at Perdue.  Bayhealth sent doctors to help with testing after March 2020.  Fowler was discharged and advised to isolate at home until the test results came back.

By March 30, 2020, at least two employees tested positive for COVID-19.  On March 30, Perdue closed the plant for deep cleaning, and on April 1, Perdue began doing temperature checks and employee screenings.

On April 3 or 4, 2020, Fowler's COVID-19 test came back positive.  On April 4, Fowler was admitted to Bayhealth Hospital via ambulance as he was in respiratory distress.  He remained in the hospital until June 9, 2020.  During his hospital stay, Fowler was diagnosed with "acute hypoxic respiratory failure associated with COVID-19, multilobar pneumonia bilaterally secondary to COVID-19, septic shock secondary to COVID-19, and an acute kidney injury."[11]  Fowler received oxygen, was intubated, and put on medications that elevated his blood pressure to help perfusion.  He was also put on a ventilator, and later required dialysis for more than a month.  He developed gastrointestinal bleeding and required treatment with a gastroenterologist.  Fowler's medication was changed when he developed atrial fibrillation.

Around the time Fowler was hospitalized, his wife, Felicia Fowler, had symptoms of COVID-19, but she was never tested.  She stated that her symptoms started about one

---

[10] *Id.*; I.A.B. II at 2.

[11] I.A.B. I at 3.

week after Fowler was admitted to the hospital. She reported that their nine-year-old daughter had no COVID-19 symptoms. On April 20, 2020, Fowler reported to Dr. Brown that he thought he contracted COVID-19 at work, but the conversation was brief. Dr. Brown did not ask any follow up questions concerning how Fowler may have been infected with the disease. Rather, their conversation was focused on the medical issues and treatment.

After his release from the hospital on June 9, 2020, Fowler went to a rehabilitation facility. He was weak and had difficulty taking a step and following his physical therapist's commands. He had a catheter because he had difficulty urinating. On July 15, 2020, he was released from the rehabilitation facility. Dr. Brown continued to treat him after his release. He observed that Fowler was depressed. Fowler had to follow up with the psychiatrist, a nephrologist, and required home visits from a physical therapist and visiting nurse. Based on an August 10, 2020 visit prior to the November 17, 2020 hearing, Dr. Brown testified that Fowler had lost weight. Fowler reported not feeling well. He had decreased energy, a cough, and shortness of breath. As a result, he continued to seek treatment from the urologist, cardiologist, and psychiatrist.

*B. Medical Opinions*

Dr. Brown testified by deposition at the November 17, 2020 I.A.B. hearing (the "First I.A.B. Hearing"). He opined that Fowler was substantially debilitated as a result of COVID-19 and was unable to return to work. He further opined that the most likely exposure and explanation was that Fowler contracted COVID-19 at work. He stated that

6

"there is no doubt that in this environment he acquired COVID-19 disease."[12] The I.A.B. noted that there was information about which Dr. Brown was unaware, mostly regarding potential alternative contacts with COVID-19 and details about Fowler's work environment. It found that "Dr. Brown agreed that he is unable to say to a reasonable degree of medical probability that [Fowler] contracted COVID-19 at work without an in-depth conversation and without obtaining information [sic] where it is likely he came into contact with the disease."[13]

Dr. Bacon, a board-certified internist specializing in infectious diseases, examined Fowler on September 29, 2020 and reviewed Fowler's medical records in conjunction with the examination.[14] Ms. Fowler provided most of the information during that visit as Fowler was barely functioning. Fowler looked exhausted, used a walker, sat in a chair, and could not lift himself onto the examination table. Dr. Bacon stated that the illness onset was in the March 27-29, 2020 timeframe, and Fowler's March 29 emergency visit suggested the possibility of a COVID-19 diagnosis at that point. Although Fowler had significant co-morbidity issues, it was COVID-19 that led to the severe respiratory distress which required intubation and a long ICU stay. Fowler also had "acute renal failure likely due to multisystem dysfunction and he developed secondary pneumonia and a GI bleed."[15] According to Dr. Bacon, Fowler was "as sick as will be seen with COVID-19 and still

---

[12] *Id.* at 5–6.

[13] *Id.* at 6.

[14] *Id.* at 7–8; I.A.B. II at 3.

[15] I.A.B. I at 9. *See also* I.A.B. II at 4.

survive."[16]  He stated further that patients that sick can develop a PTSD, post-ICU psychosis/psychiatric dysfunction.  Dr. Bacon could not say if having COVID-19 worsened Fowler's pre-existing cardiac or diabetic issues.  He opined that Fowler could not function in a work environment because he could barely function in a home environment.

Dr. Bacon concluded that Fowler acquired COVID-19 at work, and most likely in a group environment like the cafeteria.  His conclusion was largely based upon information provided by Ms. Fowler.  Dr. Bacon explained that the highest risk of catching COVID-19 is by "droplet spread," whereas "airborne spread" is "'very low risk,'" and "surface areas" are "'minimal risk.'"[17]  The cafeteria was a high-risk environment because "people are in close contact; speaking, chewing, eating, and spewing droplets throughout the air; no masks are worn while people are eating; and there is a minimum of a ten-percent risk in that environment."[18]  That percentage is the same for other restaurants and social gatherings, but that percentage, in turn, depends on how many people in that room are positive for COVID-19.[19]  Dr. Bacon noted that people can be asymptomatic, and can be contagious for a period of time before developing symptoms.  That period is "likely no more than seven to ten days[.]"[20]  Fowler's chance of contracting COVID-19 at the Perdue cafeteria, according to Dr. Bacon, was no different from him contracting it at any other

---

[16] I.A.B. I at 9.

[17] *Fowler I*, at *2 (quoting Transcript of Nov. 16, 2020 Deposition of Dr. Alfred E. Bacon, III, M.D. [hereinafter "Dr. Bacon Dep. I at _"] at 21:2–14).

[18] I.A.B. I at 10–11.  *See also* I.A.B. II at 5, 6.

[19] I.A.B. I at 12.  *See also* I.A.B. II at 5, 7.

[20] I.A.B. I at 10.

business where people gather to eat and drink, whether in a workplace or elsewhere.[21]

Dr. Bacon had a second opportunity to examine Fowler on July 27, 2022, prior to the December 2, 2022 hearing following the Superior Court's reversal and remand (the "Second I.A.B. Hearing"). Fowler still "had significant urinary retention, ongoing cardiac dysfunction, edema, swelling, and brain fog that is seen in the post-COVID-19 arena."[22] Dr. Bacon did "not see [Fowler's] condition improving to a pre-COVID-19 state."[23] Dr. Bacon adhered to his prior "opinion to a reasonable degree of medical probability that [Fowler] acquired COVID-19 within the work environment."[24] His opinion was reinforced by the knowledge that there were about 200 people in the lunchroom at lunch time. Even considering Fowler's visit to Dr. Brown's office, the highest risk was "while eating, chewing and spewing virus throughout the area, such as in the cafeteria at Perdue."[25]

In Dr. Bacon's opinion, Fowler probably contracted COVID-19 around March 20-22, 2020, prior to Perdue's lunchroom changes. Dr. Bacon also opined that "[e]ssential workers, because they were in the work environment, were at higher risk than the general population, but it is no different than another work environment. All essential workers were more exposed to COVID-19 than those who did not work."[26] However, there was

---

[21] *Id.* at 12–13; I.A.B. II at 6–7, 7 ("There is nothing unique about the cafeteria at Perdue that makes it more or less likely to contract COVID-19 than eating at a restaurant or other cafeteria.").

[22] I.A.B. II at 8.

[23] *Id.*

[24] *Id.* at 9.

[25] *Id.*

[26] *Id.* at 9–10. *See also Fowler II,* at *4.

nothing about Fowler's work itself or his specific occupation that predisposed him to COVID-19. According to Dr. Bacon, "COVID-19 is not a chicken disease, as brucellosis is a meat packing disease."[27] Rather, it "is really a work environment issue."[28]

Dr. Bacon reviewed two congressional reports, which were also submitted to the I.A.B.[29] The reports concerned COVID-19 in meatpacking facilities and indicated that "the incidence of COVID-19 in the meatpacking facilities was substantially under-reported and there was a very high prevalence of COVID-19 in the facilities in the meatpacking industry."[30] Perdue was not analyzed or identified as a source of data obtained in connection with those reports.

*C. Procedural History*

In its December 17, 2020 decision, the I.A.B. (the "First I.A.B. Decision") found that Fowler had not met his burden to show that he contracted COVID-19 at Perdue.[31] The I.A.B. concluded that there were other contacts and places that could have led to him contracting COVID-19. Because the I.A.B. determined that Fowler had not met his burden,

---

[27] I.A.B. II at 10.

[28] *Id.*

[29] *Id.* at 11. *See also* App. to Opening Br. at A364–86 (Staff of Select Subcomm. on the Coronavirus, 117th Cong., *Coronavirus Infections and Deaths Among Meatpacking Workers at Top Five Companies Were Nearly Three Times Higher than Previous Estimates* (Mem. Oct. 27, 2021)); *Id.* at A387–447 (Staff of Select Subcomm. on the Coronavirus, 117th Cong., *"Now to Get Rid of Those Pesky Health Departments!": How the Trump Administration Helped the Meatpacking Industry Block Pandemic Worker Protections* (Rep. May 12, 2022)). Fowler also included a Presidential Order which classified the meat production industry as essential. *Id.* at A362–63 (Exec. Order No. 13917, 85 Fed. Reg. 85, 26313–262314 (April 28, 2020) (invoking the Defense Production Act)).

[30] I.A.B. II at 11.

[31] I.A.B. I at 20.

the I.A.B. did not consider whether COVID-19 was an occupational disease.[32]

Fowler appealed the First I.A.B. Decision to the Superior Court. The Superior Court reversed and remanded after it determined that the I.A.B. had committed legal error and failed to base its decision upon substantial evidence in the record.[33] The Superior Court determined that "in some instances the Board made statements, which could be considered either findings or conclusions, that ignored the unrebutted medical testimony, and substituted it with findings that were not rationally supported by substantial evidence in the record."[34] The court also held that the I.A.B. had imposed an incorrect burden of proof on Fowler.[35] Because Dr. Bacon was unaware of certain contacts which could have affected his opinion regarding causation, the Superior Court remanded the case to the I.A.B. for additional testimony from Dr. Bacon to address additional contacts Fowler had prior to contracting COVID-19. The I.A.B. was also instructed to apply the correct burden of proof, namely, the preponderance of evidence standard.

Following remand, Dr. Bacon testified again by deposition and Dukes testified live. Portions of the depositions from November 17, 2020 from Dr. Bacon and Dr. Brown were

---

[32] *Id.* at 24–25 ("Since [Fowler] did not meet his burden of proof regarding his exposure, the Board does not need to discuss whether or not COVID-19 is an occupational disease within the meaning of the Delaware Workers' Compensation Act.").

[33] *Fowler I*, at *4–7.

[34] *Fowler I*, at *5.

[35] *Id.* at *7 (holding that Fowler "was required to show that it was more likely than not that he contracted COVID-19 from his workplace as compared to his outside activities that are supported by the record."). The I.A.B. erred when it stated that "no one can say for sure[,]" because Fowler was only required to prove that it was more likely than not that he contracted COVID-19 at Perdue. *Id.* (quoting I.A.B. I at 24).

11

highlighted during the Second I.A.B. Hearing.

Following the Second I.A.B. Hearing, the I.A.B. determined "that [Fowler] met his burden of proving that it was more likely than not that he contracted COVID-19 in the cafeteria at Perdue, but he did not meet his burden of proving that COVID-19 is a compensable occupational disease under the circumstances of this case (the "Second I.A.B. Decision)."[36] The Board accepted Dr. Bacon's testimony on both issues. The I.A.B. acknowledged that although it is possible for COVID-19 to be an occupational disease in theory, that determination depends on the circumstances of each case.[37]

In its analysis, the I.A.B. applied the definitions of occupational disease set forth in two decisions from this Court, namely, *Air Mod Corp. v. Newton* ("*Air Mod*")[38] and *Anderson v. General Motors*.[39] It held that Fowler had failed to show that COVID-19 was a compensable occupational disease. At this point, we pause to explain the tests our Court established for determining whether a disease qualifies as a compensable occupational disease.

In *Air Mod*, this Court undertook to define what is a compensable occupational disease. We observed that we had "recently taken the position that the Delaware Workmen's Compensation Act may not be construed so as to be transformed into a health

---

[36] I.A.B. II at 14.

[37] *Id.* at 15 (citing *Cacchioli v. Infinity Consulting Solutions*, No. 1501061 (Del. I.A.B. Mar. 9, 2022)).

[38] *Id.* at 15–16 (quoting *Air Mod Corp. v. Newton*, 215 A.2d 434, 441–42 (Del. 1965)).

[39] *Id.* at 16 (quoting *Anderson v. General Motors*, 442 A.2d 1359, 1360 (Del. 1982)).

12

insurance statute."[40]  Because we found the definition of "compensable occupational

disease" contained in our statute to be unhelpful, we examined case law from other

jurisdictions, including New York.[41]  After considering language employed by New York

Court of Appeals and expressing accord with New York Court of Appeals' rationale and

definition of an occupational disease,[42] we defined a compensable occupational disease

under our statute as follows:

> [A] compensable occupational disease, within the meaning of our Act, is one resulting from the *peculiar nature* of the employment, i. e., from working conditions which produce the disease as a *natural incident of the particular occupation*, attaching to that occupation a hazard different from, and in excess of, the hazards attending employment in general.[43]

Seventeen years later, in *Anderson*, we applied this standard and rejected an

automotive plant employee's claim that his allergic rhinitis was an occupational disease.

We described the test as follows in *Anderson*:

> For an ailment to be found to be a compensable occupational disease, evidence is required that the employer's working conditions produced the

---

[40] *Air Mod Corp.*, 215 A.2d at 442 (citation omitted).

[41] *Id.* (observing that "[t]he problem of the proper judicial definition of the undefined term 'compensable occupational disease' was met in New York in *Detenbeck v. General Motors Corporation*, 309 N.Y. 558, 132 N.E.2d 840 (1956).").  *See also* 19 *Del. C.* § 2301(4).

[42] Our Court in *Air Mod* quoted language from *Detenbeck v. General Motors Corporation*, stating that "the test of what is an occupational disease is the same whether the employer the employee is decrepit or in normal health.  *There must be a recognizable link between the disease and some distinctive feature of the claimant's job*."  *Air Mod Corp.*, 215 A.2d at 442 (emphasis added) (quoting *Detenbeck v. General Motors Corporation*, 132 N.E.2d 840, 842 (1956)).  Also in *Air Mod*, we considered language from another New York Court of Appeals decision, namely, *Harman v. Republic Aviation Corp.*, 82 N.E.2d 785 (N.Y. 1948).  There, the New York Court of Appeals stated that "[a]n ailment does not become an occupational disease simply because it is contracted on the employer's premises.  *It must be one which is commonly regarded as natural to, inhering in, an incident and concomitant of, the work in question*."  *Air Mod Corp.*, 215 A.2d at 442 (emphasis added) (quoting *Harman*, 82 N.E.2d at 786).

[43] *Air Mod Corp.*, 215 A.2d at 442.

ailment *as a natural incident of the employee's occupation in such a manner as to attach to that occupation a hazard distinct from and greater than the hazard attending employment in general.*[44]

Although in *Air Mod* we used the phrase, "a hazard *different* from, and *in excess of*," as opposed to "a hazard *distinct* from and *greater than*," the test remained substantively the same.

In *Anderson*, we held that an employee of General Motors failed to establish by substantial competent evidence that his ailment — allergic rhinitis — resulted from the peculiar nature of his employment at the automobile assembly facility rather than from his own peculiar predisposition.[45]  We observed that "simply because there was evidence to believe [allergic rhinitis] had either been contracted or aggravated on his employer's premises is legally insufficient to find it to have been an occupational disease."[46]  After examining the record evidence, we stated that "neither the employee's testimony nor that of his treating physician was sufficient to establish that the working conditions at the General Motors plant produced his ailment, allergic rhinitis, as a natural incident of his occupation."[47]  Rather, the employee's breathing allergy was attributable not only to dust (household as well as factory) but also to nature's pollens.  We said that the "employee's allergy-induced breathing difficulty resulted from the 'stimuli (of) the everyday world.'"[48]

---

[44] *Anderson*, 442 A.2d at 1361 (emphasis added).

[45] *Id*.  Our Court described "allergic rhinitis" as an "inflammation of the nasal mucous membrane caused by allergies."  *Id*. at 1359.

[46] *Id*. at 1360 (citing *Air Mod Corp.*, 215 A.2d at 442).

[47] *Id*. at 1361.

[48] *Id*.

Accordingly, we affirmed the I.A.B.'s denial of his claim and its determination that allergic rhinitis was not an occupational disease based upon "the absence of any persuasive causal evidence that employment at the General Motors assembly plant had a tendency to induce allergic rhinitis[.]"[49]

Fowler claims that the I.A.B. misapplied the standard we established in *Air Mod* and *Anderson* by using certain words that strayed from the language in our tests and, in effect, made the test more difficult to satisfy. He points primarily to the I.A.B.'s statement that there is nothing "*unique* about poultry processing plants or [Fowler]'s job" in particular that would increase his chances of contracting COVID-19. He focuses, in particular, on several parts of the Second I.A.B. Decision including the following:

> The Board also accepts Dr. Bacon's testimony that he is unaware of there being anything *unique* about poultry processing plants or [Fowler]'s job in the box area that would increase the chances of him contracting COVID-19.[50]
>
> . . . .
>
> There is nothing *unique* about the poultry industry or [Fowler]'s job that would put him in closer contact with COVID-19 itself than anywhere else where people gather, eat, drink and work. There is nothing *unique* about the Perdue cafeteria that makes it more or less likely to contract COVID-19 than eating at a restaurant or another cafeteria.[51]
>
> . . . .
>
> The distinct hazard [Fowler] had at Perdue was the lunchroom environment, not his actual work environment. The same hazard is specific to any event or circumstance where there is a large number of people in the same room together. The Board accepts Dr. Bacon's opinion that there was not a greater

---

[49] *Id.*

[50] I.A.B. II at 17 (emphasis added).

[51] *Id.* at 18.

15

hazard of working at Perdue and eating in the lunchroom for [Fowler] to contract COVID-19 than contracting it in the employment environment in general.[52]

He argues that our language in *Anderson* does not require that exposure be "exclusively" or "uniquely" in the workplace.

In its October 18, 2023 decision affirming the Second I.A.B. Decision, the Superior Court recognized that the *Anderson* standard requires "that the hazard of contracting the disease as an incident of the claimant's employment must be both (1) 'distinct from' and (2) 'greater than' that attending employment in general. Fowler's assertions fall short because he focuses upon the second prong to the exclusion of the first."[53] Although the I.A.B. had used the term "unique," when discussing the *Anderson* and *Air Mod* tests, the Superior Court held that considering the full context of the I.A.B.'s statements, the I.A.B. did not commit reversible error:

> To the extent that the use of the term "unique" implies that in order for an illness to be compensable as an occupational disease, it must be associated with only one occupation, the Court agrees that this would not be a correct statement of the law. However, the Board here never made such a claim; instead, its analysis demonstrates the opposite. It certainly would have been preferable for the Board to have employed the terminology used by the Supreme Court. This Court is unwilling to find, however, given the context and the Board's full analysis, that the use of that term constitutes reversible legal error.[54]

The Superior Court observed that the I.A.B. had accepted Dr. Bacon's testimony

---

[52] *Id.* at 19.

[53] *Fowler II*, at *6.

[54] *Id.* at *7.

16

that the cafeteria at Perdue was a "particularly hazardous environment,"[55] and it agreed that the record supported that assessment, but it held that Fowler had failed to prove that the hazard was "distinct" from attending employment in general.[56]

In focusing on the "distinct hazard" portion of the test, the Superior Court held that COVID-19 was not a natural incident of Fowler's peculiar occupation as a boxer in the poultry industry.[57] The court distinguished several cases where our courts had found a disease to be an "occupational disease" and explained that "there was no evidence presented that COVID-19 was distinctive to the environment of a poultry processing plant."[58]

The Superior Court rejected Fowler's argument that "by mere virtue of meat processing workers' having contracted COVID-19 at a higher rate because they were essential workers—COVID-19 is an occupational disease."[59] It concluded that "COVID-19 cannot be a hazard distinct from that of employment in general in a situation in which all other essential workers faced the same disease every day by attending employment."[60] The Superior Court considered the Congressional reports and found that there was:

---

[55] *Id.* at *8.

[56] *Id.*

[57] *Id.* at *9.

[58] *Id*. at *10. The Superior Court, for example, found that *Evans* was distinguishable because there was no evidence that COVID-19 was distinctive to the environment of a poultry processing plant like mycobacterium avium intracellulare ("MAI") related illnesses would be. *Id.* (citing *Evans Builders, Inc. v. Ebersole*, 2012 WL 5392148, at *1, *2–3 (Del. Super. Oct. 11, 2012), *aff'd sub nom. Evans Builders v. Ebersole*, 2013 WL 2371705 (Del. Feb. 11, 2013)).

[59] *Id.* at *11 (citation omitted).

[60] *Id.*

17

> [N]o finding by the Subcommittee that COVID-19 was more prevalent in meatpacking facilities due to the occupations of the individual workers. Rather, the subcommittee cited inadequate masking and barriers as leading to the high infection rates: not only were such measures not peculiar to poultry or other meatpacking plants, but there is no indication in the record of the extent to which these measures had even been recommended by late March 2020, when Fowler was infected.[61]

In sum, the Superior Court held that the I.A.B. committed no reversible legal error in determining that COVID-19 was not an occupational disease, and that the I.A.B.'s decision was supported by substantial record evidence.[62]

Fowler now claims on appeal that both the I.A.B. and the Superior Court misapplied the applicable standard in determining that COVID-19 was not an occupational disease. He argues that the Superior Court, like the I.A.B., conflated the "distinct hazard" language of *Anderson* with a requirement of uniqueness of the hazard to Perdue. By doing so, he claims that the Superior Court erred in setting the bar too high, *i.e.*, that "distinct" does not mean "unique." He also claims that the Superior Court erred by limiting its analysis of what is a "distinct hazard" to the box room, as opposed to the entire premises including the cafeteria. We disagree with his contentions for the reasons explained below.

---

[61] *Id.* at *11 (citing Staff of Select Subcomm. on the Coronavirus, 117th Cong., *Coronavirus Infections and Deaths Among Meatpacking Workers at Top Five Companies Were Nearly Three Times Higher than Previous Estimates* (Mem. Oct. 27, 2021)).

[62] *Id.* at *12.

*III.* *ANALYSIS*

A. *The Superior Court and I.A.B. Did Not Err in Determining that Fowler Failed to Show by Substantial Evidence That COVID-19 Was An Occupational Disease*

1. *Standard of Review*

When this Court reviews an I.A.B. decision, the Court is "['']limited to an examination of the record for errors of law and a determination of whether substantial evidence exists to support the Board's findings of fact and conclusions of law.'"[63] We have defined "substantial evidence" as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[64] "If the Board decided legal issues, this Court reviews them *de novo*. If there is no error of law and substantial evidence supports the Board's findings, 'the Board's decision must be affirmed.'"[65]

2. *Although Fowler Established a Hazard "Greater Than" Attending Employment in General, He Failed to Establish Hazard "Distinct From" the Hazard Attending Employment in General*

The question before this Court is whether the Superior Court erred in affirming the I.A.B.'s determination that Fowler failed to prove that COVID-19 was an occupational disease under these circumstances. The Superior Court correctly understood that the *Anderson* test required Fowler to "establish by substantial competent evidence" that his

---

[63] *Zayas v. State*, 273 A.3d 776, 784–85 (Del. 2022) (citing *Roos Foods v. Guardado*, 152 A.3d 114, 118 (Del. 2016)).

[64] *Id.* at 785 (citing *Roos Foods*, 152 A.3d at 118).

[65] *Id.* (quoting *Stevens v. State*, 802 A.2d 939, 944 (Del. Super. 2002)) (citing *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 899 (Del. 1994) (internal quotation marks omitted in original)).

COVID-19 infection "resulted from the peculiar nature of" Fowler's employment.[66] The Superior Court also correctly understood that in order to prove that peculiar nature under *Air Mod* and *Anderson*, Fowler had to show that Perdue's working conditions produced the ailment (here, COVID-19) as a natural incident of his occupation in such a manner as to attach to it "a hazard distinct from and greater than the hazard attending employment in general."[67] Satisfaction of both aspects, namely, "a hazard *distinct from*" and a hazard "*greater than*" is required. Satisfying only one part of this test is insufficient.

The Superior Court correctly held that Fowler presented evidence sufficient to show that the cafeteria at Perdue presented a hazard *greater than* that attending employment in general. This aspect of the ruling is supported by substantial evidence. Dr. Bacon testified about the high-risk environment in the cafeteria resulting from the number of people, the time period, and droplets that spewed from eating and chewing.[68] He also testified that "[']essential workers, because they were in the work environment, were at a higher risk than the general population.'"[69] The I.A.B. and the Superior Court characterized his testimony as unrebutted. Therefore, Fowler established a hazard at Perdue that was "greater than" that attending employment in general.

However, the Superior Court also correctly held that Fowler lacked evidence

---

[66] *Anderson*, 442 A.2d at 1361.

[67] *Id.*

[68] *Fowler II*, at *8.

[69] *Id.* (citation omitted). *See also* I.A.B. II at 9; App. to Opening Br. at A315 (Transcript of Nov. 29, 2022 Deposition of Dr. Alfred E. Bacon, III, M.D. [hereinafter "Dr. Bacon Dep. II at _"] at 28:12–15).

20

sufficient to show that the cafeteria at Perdue was a hazard "distinct from" that attending employment in general. The Superior Court considered and relied upon Dr. Bacon's unrebutted testimony on this point as well.[70] Dr. Bacon testified that contracting COVID-19 in the lunchroom of Perdue was no different than contracting it at Home Depot or Lowe's, or a non-work environment such as a wedding, funeral, college cafeteria, restaurant, or bar. Although the record contains information about the number of people in the Perdue cafeteria, the record lacks evidence sufficient to show how that situation at Perdue presented a "hazard distinct" from that involving other essential employees eating in cafeterias during the early period of the pandemic.

The Superior Court relied upon an Ohio Court of Appeals opinion, *Yeager v. Arconic Inc.*,[71] which held that COVID-19 was not an occupational disease because common illnesses to which the general public is exposed are not compensable occupational diseases.[72] We would be troubled had the Superior Court's analysis stopped there because under the *Anderson* and *Air Mod* standards, a common place illness, such as allergic rhinitis, pneumonia, or COVID-19 could, under the right circumstances, be a "hazard distinct" from that attending employment in general.[73] Even Perdue does not disagree that

---

[70] *Fowler II*, at *12.

[71] *Yeager v. Arconic Inc.*, 2022 WL 2114656, at *2, *3 (Ohio Ct. App. June 13, 2022), *appeal not allowed sub nom. Yeager v. Arconic Inc.*, 195 N.E.3d 1046 (Ohio Oct. 11, 2022) (TABLE).

[72] *Fowler II*, at *9 (citing *Yeager*, 2022 WL 2114656, at *2 (quoting *Ingram v. Conrad*, 2001 WL 1674105, at *12 (Ohio Ct. App. Dec. 20, 2001), *appeal not allowed sub nom. Ingram v. Conrad*, 766 N.E.2d 1002 (Ohio May 1, 2002) (TABLE))).

[73] For example, we stated in *Anderson* that "if there had been evidence of any incidence of allergic rhinitis within the employee's work force at the General Motors plant or other evidence of a causal connection, the case would be different." 442 A.2d at 1361. But we made clear that the only reasonable conclusion that could be drawn from the available evidence was that the claimant's

21

COVID-19 could qualify as an occupational disease "under the proper facts."[74]

The flaw in Fowler's case is that COVID-19 was not "a natural incident" of, or an inherent and concomitant aspect of his job as an employee at Perdue.[75] In cases where courts have found that a disease qualifies as an occupational disease, claimants have established that they contracted the illness due to the peculiar nature of the job. In *Diamond Fuel Oil*, for example, the employee's job, which involved servicing and installing oil burner equipment, required exposure to fuel oil #2 more frequently and in a larger amount than individuals would be exposed otherwise.[76] This Court affirmed the Superior Court's reversal of the I.A.B. finding that the employee's chronic interstitial nephritis, a kidney disease, was not caused by his employment at the fuel company. The employee identified heating fuel oil #2, a petroleum hydrocarbon with known health hazards, as a substance to which he was exposed for over nine years. We held that he had "produced evidence that his employer's working conditions through exposure to heating fuel oil #2 produced his kidney disease as a natural incident of his employment in such a manner as to attach to his occupation a hazard distinct from and greater than the hazard attending employment in general."[77]

---

disease resulted from "[']the peculiar nature of the employee rather than from the peculiar nature of employment.'" *Id.* (citation omitted).

[74] Answering Br. at 5.

[75] *Air Mod Corp.*, 215 A.2d at 442.

[76] *Diamond Fuel Oil v. O'Neal*, 734 A.2d 1060, 1061–65 (Del. 1999). Exposure to Fuel #2, according to the company's own Material Safety Data Sheet, can lead to "[d]egenerative changes in the liver, kidneys and bone marrow may occur with prolonged, high concentrations." *Id.* at 1061.

[77] *Id.* at 1066.

In *Evans Builders Inc.*, a Superior Court decision summarily affirmed by this Court, the employee's work as a carpenter at a poultry house exposed him to mycobacterium avium intracellulare ("MAI") at a higher quantity and frequency than that which was latent in other potential sources of exposure and as compared to employment outside the poultry industry.[78] The employee adduced expert evidence that his intense exposure to the MAI organism in the poultry environment was very likely the cause of his pneumonia, which led to part of his lung being removed. The I.A.B. ruled that his pneumonia and subsequent disability was a natural incident of his employment at the poultry house.

In contrast, in *Burns v. Wilson*,[79] the Superior Court rejected a legal malpractice claim on the basis that the plaintiff's allegations relating to the underlying worker's compensation claim were inadequate. The Superior Court considered the plaintiff's allegations that the attorney was negligent in not presenting certain evidence including evidence of a causal link between the mold and mildew and his disease (sarcoidosis of the lungs, heart, and brain). The court concluded that any such error was harmless "because mold and mildew cannot be the cause of an occupational disease under the circumstances."[80] It explained that:

---

[78] *Evans Builders, Inc.*, 2012 WL 5392148, at *1–3. The Superior Court held that the employee's MAI induced pneumonia was related to his work as a carpenter in the poultry industry. The I.A.B. accepted an expert's opinion that the MAI organism was more prevalent in the poultry industry than in other environments. The Superior Court also held that the I.A.B. properly made the required findings and considered the *Anderson* factors, even though the I.A.B. had used different language than that used in *Anderson*. *Id.* at *3 (noting that "[p]erhaps in less than artful fashion, the Board made the *Anderson* analysis," and that "[t]he Board considered the *Anderson* factors and made the required findings, despite being roundabout.").

[79] 2015 WL 413452 (Del. Super. Jan. 30, 2015).

[80] *Id.* at *7

> [E]xposure to mold from working in a tire store does not qualify as an occupational disease. This is because mold from a leaky building is not a hazard "which is commonly regarded as natural to [or] inhering in" working in a tire store.

> Because mold and mildew are not hazards caused by the specific nature of working in a tire store, but are hazards that might just as readily be encountered in other occupations or in everyday life apart from employment, the Court finds that any alleged failure by Wilson to present evidence related to mold/mildew is harmless error and not a proximate cause of Plaintiff's failure to prevail on his IAB claim.[81]

Fowler argues that COVID-19 was a natural incident to working at Perdue in a pandemic because the Perdue lunchroom was a high-risk location for COVID-19. However, just as the Superior Court held in *Burns* that "mold from a leaky building is not a hazard 'which is commonly regarded as natural to [or] inhering in' working in a tire store[,]"[82] contracting COVID-19 in Perdue's cafeteria was not "natural to" Fowler's work at the poultry factory. A claimant cannot succeed merely by establishing that he contracted COVID-19 at his employment. Being an essential worker in Perdue's plant (including its crowded cafeteria) during the pandemic is not enough to establish this link. Fowler failed to show how COVID-19 is natural to a poultry factory in the same way MAI related illnesses are natural to a poultry factory.

Fowler's congressional reports showing the prevalence of COVID-19 in meat factories did not close the evidentiary gap as they did not establish that COVID-19 is natural incident to his employment.[83] As noted above, Perdue was not analyzed or

---

[81] *Id.*

[82] *Id.* (quoting *Air Mod. Corp.*, 215 A.2d at 442).

[83] I.A.B. II at 11. *See* App. to Opening Br. at A364–86 (Staff of Select Subcomm. on the

identified as a source of data for those reports. Although the congressional reports did suggest that the meat industry underreported COVID-19 cases, that still did not establish that there was something specific about working in the meat industry that led to contracting COVID-19. At best, it is consistent with Dr. Bacon's testimony that crowded places where people gathered side by side, breathing the droplets from the area, constituted a higher risk environment, but not a hazard distinct from other types of employment generally.[84]

Fowler also challenges the Superior Court's decision on the grounds that the Superior Court "appears to limit the analysis to [Fowler]'s job in the box room[.]"[85] We agree with Fowler that compensable injuries are injuries that occur at "a time and place where it would be reasonable for an employee to be under the circumstances[,]"[86] and that "incidental acts" such as "'eating, drinking, smoking, seeking toilet facilities, and seeking fresh air, coolness or warmth,'" are within the course of employment.[87] But we reject

---

Coronavirus, 117th Cong., *Coronavirus Infections and Deaths Among Meatpacking Workers at Top Five Companies Were Nearly Three Times Higher than Previous Estimates* (Mem. Oct. 27, 2021)); *Id.* at A387–447 (Staff of Select Subcomm. on the Coronavirus, 117th Cong., *"Now to Get Rid of Those Pesky Health Departments!": How the Trump Administration Helped the Meatpacking Industry Block Pandemic Worker Protections* (Rep. May 12, 2022)); *Id.* at A362–63 (Exec. Order No. 13917, 85 Fed. Reg. 85, 26313–262314 (April 28, 2020) (invoking the Defense Production Act)).

[84] I.A.B. I at 11, 12. *See also* I.A.B. II at 5, 6.

[85] Opening Br. at 37. *See also* Reply Br. at 4.

[86] *Rose v. Cadillac Fairview Shopping Ctr. Props. (Delaware) Inc.*, 668 A.2d 782, 786 (Del. Super. 1995), *aff'd sub nom. Rose v. Sears, Roebuck & Co.*, 676 A.2d 906 (Del. 1996). *See also Tickles v. PNC Bank*, 703 A.2d 633, 637 (Del. 1997) (observing that "the employee does not have to be injured during a job-related activity to be eligible for worker's compensation benefits," and that "incidental acts, including eating, drinking, smoking, seeking toilet facilities and seeking fresh air, coolness or warmth" can be considered to be "in the course of employment." (citations omitted)).

[87] *Tickles*, 703 A.2d at 637. *See also* Reply Br. at 5.

Fowler's claim of error because both the I.A.B.[88] and the Superior Court[89] considered evidence concerning both the box room and the cafeteria. The decision by the I.A.B. is supported by substantial evidence showing that regardless of where on Perdue's premises Fowler contracted COVID-19, Fowler failed to establish the necessary relationship between his work environment at Perdue, and COVID-19 as "natural incident to" that employment.

The Superior Court did not err in affirming the decision of the I.A.B. because

---

[88] The I.A.B. found:

> The problem with [Fowler]'s job was the same for every employee at Perdue, which was that they ate lunch in the cafeteria, sitting close to each other without any precautions or distancing during a hazardous activity of eating and speaking, which leads to spewing droplets in close proximity to one another for up to 30 minutes at a time. According to Dr. Bacon's unrebutted testimony, eating in a cafeteria at Perdue is no different than eating at any other employment site; any employer with essential workers at work will have an environment that has risks."

I.A.B. II at 18–19. *See also e.g.*, *id.* at 5 ("[H]e did not get it in the room where he worked; it is more likely [than that [Fowler] acquired it in the cafeteria environment or walking in the door of the building with ten other people surrounding him without wearing masks."); *id.* ("Dr. Bacon had no doubt that [Fowler] acquired COVID-19 in the cafeteria at Perdue."); *id.* at 6–7 ("[Fowler]'s chance of contracting COVID-19 at the cafeteria at Perdue is no different than him contracting it at any other business or anywhere else where people eat and drink, whether it is a workplace or in the world itself[.]").

[89] *See e.g.*, *Fowler II*, at *9 ("The singular fact that Fowler contracted COVID-19 in the cafeteria on Perdue's premises is not legally sufficient to classify it as an occupational disease. People from all over Delaware have contracted COVID-19, including people not working as boxers at Perdue." (citing *Anderson*, 442 A.2d at 1360)); *id.* ("As to work environments, Dr. Bacon testified that contracting COVID-19 in the cafeteria at Perdue was "no different" than contracting it at any other business, such as at Home Depot or Lowe's." (citing Dr. Bacon Dep. I at 32:6–15)); *id.* at *10 ("Dr. Bacon further opined that there was a difference between Fowler's work environment compared with that of an unmasked healthcare worker directly exposed to COVID-19. Thus, there is nothing natural to, inhering in, or an incident and concomitant of his particular occupation as a boxer that exposed Fowler to COVID-19." (citing Dr. Bacon Dep. II at 28:10–29:14)); *id.* at *11 ("Moreover, during the COVID-19 pandemic, employees in a number of professions—including lawyers— were deemed essential. This cuts against Fowler's arguments because it demonstrates that employees of all professions that were deemed essential faced a risk of contracting COVID-19." (citing Dr. Bacon Dep. II at 31:6–32:9)).

26

Fowler's evidence was not sufficient to show that COVID-19 was "natural to" his employment as an essential employee at Perdue. Therefore, based upon the record before us, we agree with the Superior Court that the decision by the I.A.B. is free from any reversible legal error and is supported by substantial evidence.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the decision of the Superior Court.